Hillsborough, ⎱
May 2, 1939. ⎰ No. 3073.

ALBERT HUMPHREYS, *Adm'r v.* JOSEPH ASH.

McLane, Davis & Carleton (Mr. Carleton orally), for the plaintiff.

Wyman, Starr, Booth, Wadleigh & Langdell (Mr. Booth orally), for the defendant.

PAGE, J. Taking the evidence most strongly for the plaintiff, the following facts appear. On the Sunday evening when the accident occurred, the deceased and his seven-year-old brother, who lived with their parents on Boynton Street in Manchester, were playing in a neighbor's yard across the street from their home. It became dark enough so that the street-lights were on and some, if not all, of the passing automobiles also showed lights. Boynton Street, running north and south, was at the time a part of Route 101 and was "much travelled."

The mother of the boys went to the front porch of her house on the westerly side of the street and called for them to come home. The boys came to the easterly curb, but the mother, seeing three cars approaching from the south, ordered the children not to proceed, but to wait for the cars. Immediately after the third car passed northerly, Bruce, the decedent, ran into the street and was hit by the car of the defendant, which was being driven southerly.

The speed of the defendant's car was variously estimated, by the defendant at between twenty-five and thirty miles an hour, by the mother at thirty-five. The defendant did not see the decedent until he darted out from behind the third north-bound car, at a distance of about twenty-five feet from him. He thought at first that it was an animal and immediately set his four-wheel brakes and kept them set with all his power until he had come to a stop. Not until he was within ten feet did he recognize the fact that the decedent was a boy. The boy was hit with such force that he was thrown about twenty-five feet. There was no evidence that the defendant could have done anything to avoid the accident after he saw the boy dart from behind the north-bound car. Consequently the only issue concerning the defendant's negligence was that concerning the speed at which he was driving before he saw the boy, and the jury were so instructed.

Upon the issue of speed the plaintiff called Patrick J. Foley, inspector in charge of the Accident Prevention Bureau of the Manchester Police Department. He testified to having gone to the scene

of the accident soon after it occurred and to having measured the brake marks left by the defendant's car. They extended without interruption for a distance of sixty-six feet. He also testified that within three hours he made two tests of the brakes of the defendant's car, and that he made others the next morning. All tests were made upon streets with the same type of surface as existed at the place of the accident. He had made similar tests with other cars over two hundred times. His qualifications as an expert were not questioned.

Mr. Foley was asked: "Assuming a condition of the highway, such as you found it on the night of the accident, in front of the Humphreys' home, and assuming the brakes of the Ash car were in good condition; and, assuming that the operator of the car put the brakes on as hard as he could, and that the car travelled a distance of 66 feet before it came to a stop, showing brake marks for that distance, what, in your opinion, was the speed of that car, just before the brakes were applied?" The defendant objected: "Even though this man is an expert, it is simply speculation." The answer, admitted subject to exception, was "Approximately forty-five miles an hour."

The plaintiff emphasizes the thought that the tests made by the witness were with the defendant's car, and that the witness consequently was specially qualified to answer. But the witness did not describe the tests more than to say that the places where they were made had surface conditions similar to those at the place of the accident. As to the pressure exerted by the defendant it is apparent that he depressed the brake enough to result in distinct solid tracks. As to that exerted by the witness in the tests there is no evidence. While the atmospheric conditions when the evening tests were made can be assumed to be similar to those at the time of the accident, there can be no assumption that they were the same the next morning. It is not disclosed whether the weight carried in the car was the same on all three occasions, or whether the air-pressure in the tires gave similar resistance. There is no intimation whether the grade of the places of the tests was comparable to that where the accident occurred, though there is evidence that the surfaces were similar. The results of the tests were not offered as experimental evidence, and the court did not have occasion to rule upon them as such.

The hypothetical question did not assume the condition of the brakes of the defendant's car disclosed by the tests, but assumed only that they were in good condition. The plaintiff is not, therefore, in a position to argue, as he has, that the tests made by the witness

gave him peculiar qualifications to answer the question with respect to this particular car. Even if he had such qualifications, the question did not proceed upon that theory. The answer given, that the brake-marks resulted from a speed of forty-five miles an hour, appeared upon cross-examination to differ widely from those indicated by the tables that are commonly the basis of expert testimony. Mr. Foley admitted that, according to those tables, brake-marks sixty-two feet in length reflect a speed of thirty miles an hour. He attempted to evade the effect of this by saying that four-wheel brakes which would stop in that distance a car going at that speed were sufficient to meet the requirements of the Motor Vehicle Department. By this must be understood standard braking power. Brakes of less efficiency could not be said to be in good condition. But the hypothetical question assumed good condition. Further, the plaintiff specifically admitted that the brakes were in good condition, and it was not claimed that they were super-adequate. Mr. Foley admitted on cross-examination that a stop in 112 feet at forty-five miles an hour reflects good braking power. As he further admitted, his testimony comes to this: either the actual speed was far less than he stated it to be, or the defendant's brakes were nearly twice the standard efficiency. Whether the one or the other inference is to be drawn is purely speculative. That drawn by the witness would be reasonable only if there were evidence that the brakes were super-efficient, and this was not suggested or claimed. The answer was speculation, since it was based upon "good condition," and the objection made was sound, as matters turned out. But as the character of the answer did not appear until after cross-examination, the defendant's exception cannot now be of avail. After its character appeared, the defendant should have moved to strike out the testimony.

Nevertheless a speed of forty-five miles an hour could be inferred only by conjecture. Upon the evidence, the only non-conjectural speed was something more than thirty miles an hour, or possibly something more than thirty-five miles an hour, the higher figure being inferable from the mother's estimate of thirty-five miles, made upon momentary observation at a time of great excitement, when the car was ten or fifteen feet from her son, and after the brakes had been applied.

It was a question for the jury whether that speed was reasonable. Laws 1937, c. 125, s. 1. But liability finally rests upon the actual effectiveness of the speed, if unreasonable. The effect of a less speed

invites investigation. According to the evidence, standard braking power permits a stop at twenty-five miles an hour within forty-three feet of the point of application. Mr. Foley said that the defendant could have stopped at that speed in between twenty and twenty-five feet. Having in mind his other testimony, it would not seem to be findable without conjecture that at twenty-five miles an hour the defendant could have stopped his car before reaching the point where the boy was hit. As to any speed less than twenty-five miles an hour, the stopping-distance is purely speculative.

The plaintiff argues that if the defendant had veered left, instead of very slightly right (as he did), the accident would have been avoided. The defendant's right fender was dented, from which it could be inferred that the boy was nearly clear when struck. The boy was first seen by the defendant at a distance of twenty-five feet, running straight across the street. When the boy saw the car, he swerved sharply to the south, upon a course converging rather acutely with that of a car. Under these circumstances, a left turn by the defendant would probably have caused an earlier impact, instead of avoiding it.

But it might be inferred that if the speed of the defendant had been five miles an hour less, and that of the boy the same, the retardation of the car under its brakes would have left the boy clear. While a jury could readily find that the sole cause of the accident was the sudden appearance of the boy from behind northbound traffic and his confusing change of course, without apparent attempt to stop, and while the question of causation is painfully close, we do not feel at liberty to sustain generally the exceptions to the denial of a nonsuit and a directed verdict.

The motion for nonsuit raises the question whether the mother, a beneficiary of the recovery equally with the father, is barred by her own negligence under the rule of *Niemi* v. *Railroad*, 87 N. H. 1. When she called to Bruce to come home, she immediately saw cars approaching from the south, and bade him wait. He obeyed. She gave him no warning about cars approaching from the north. Being familiar with the neighborhood and the traffic, she knew, as she said, that cars were likely at that time to be approaching from the north. From the porch where she stood, her view was obstructed to the north. She could not have seen a car approaching from that direction unless she "stepped off the porch entirely." She did not step off and look, though she "expected cars might come from the north at any time." If she had herself crossed the street without looking

north, she would have been barred by her own negligence. *Brown v. Mailhot,* 89 N. H. 240. She was exercising custody and control over a boy incapable of care for his own safety. In permitting him to cross without herself looking to the north, she was as negligent for his safety as she would have been for her own safety had she crossed without looking. The motion for a nonsuit as to her should have been granted, unless procedural convenience suggested another course. *Niemi v. Railroad,* 87 N. H. 1, 12. For the avoidance of possible confusion and prejudice, it would seem better to submit the case for a verdict of full recovery, the court to deduct the mother's distributive share before giving judgment.

There was some evidence that the defendant was blinded by the lights of the north-bound cars. In the course of argument, counsel for the plaintiff said, "the best Mr. Ash would say, he was blinded a distance of perhaps fifteen feet. Taking Mr. Ash's statement, or Mr. Wyman's suggestion in argument, it was a few . . ." The unfinished statement was here interrupted by Mr. Wyman's objection that he had made no suggestion that his client was blinded. He was given an exception, and the argument was not continued. Mr. Wyman had in fact made no suggestion about blinding, but it does not appear that the argument which was interrupted was going to assert anything prejudicial. *Buttrick v. Association,* 87 N. H. 194.

The defendant excepted to the following statement by counsel for the plaintiff in closing: "Mr. Wyman very fairly said that if you find that this man was driving that Buick car at an unreasonable rate of speed, that if you find that he didn't do anything to slow down when the lights blinded him, if you find that those facts are negligent conduct on his part, Mr. Wyman has very clearly told you that you should bring in a verdict for the plaintiff in this case." Upon objection that no such language was used, the court said: "Do you want it to stand? I did not hear all of Mr. Wyman's argument." Counsel then added: "With this reservation, with the further requirement that if Mrs. Humphreys was not negligent in this case." There was a renewed exception, which was allowed. Mr. Wyman had said nothing remotely like the statement attributed to him. As amended, the misquotation, it is urged, was not of a fact, but of a rule of law, and a true statement of the law. But it was likely that the jury would understand that Mr. Wyman had admitted some of the facts in the attributed statement. The "quotation" was widely fictitious, and we may not assume that such a wide departure from fair comment was harmless. The jury were not cautioned to take

their own memory and to disregard any misstatement that may have been made. Nothing was done having any tendency to correct the error. When the court noted the exception after objection was specifically made, it must be understood that a ruling was made that the argument was proper.

The defendant requested that the court give the following instructions:

(19) "If you find that Mrs. Humphreys was acting as caretaker of Bruce Humphreys in behalf of herself and her husband and that she was negligent, and that such negligence caused or contributed to cause the accident, then your verdict will be for the defendant." The object of this request was the imputation to Mr. Humphreys of any negligence of his wife. Each parent would be entitled to an equal share in the distribution of the verdict unless such distributee should be found contributorily negligent. *Niemi* v. *Railroad*, 87 N. H. 1. The mother was assuming for the moment the custody of the child and care for his safety. The father had equal right to do so. P. L., *c.* 290, *s.* 4. The father was at the time engaged in certain matters pertaining to his business. He was asked: "You had left the care of the boy to your wife?" He answered: "That is true." It is urged that the mother was the father's agent in his care for the child. We do not understand that such is the effect of the relationship of the parents to each other with respect to their watchfulness over their children. If the husband chooses to permit his wife to exercise her rights and duties with respect to the child without interference from him, he does not constitute her as his agent; he merely holds in abeyance the exercise of his own rights and duties. Although the fault of the mother was such as to bar her from benefiting from the fund, it does not follow that the father is also barred.

(23 *b*) "You cannot award damages for the grief of the parents over the loss of their son." The jury were told what were the elements of damages, and nothing was said about this. A proper precaution would suggest to the court the giving of the instruction, especially when it is requested. If the instruction were not given, the jury would usually permit human sympathy to leap the bounds specifically laid down for them, and this appears to be a case where the request should have been given.

(23 *c*) "Since the child was a child of four, for many years he would have been a source of expense." (23 *f*) "Among other things, you will consider the age of the child and the probable duration of his life but for the injury, taking into account his liability to die on account

of his tender age." (23 *g*) "In considering the question of damages, you will bear in mind that the present award of a smaller sum would be equivalent to a larger sum for the estate at the expiration of the decedent's expectancy of life." The requests stated the law with substantial accuracy. *Golej* v. *Varjabedian*, 86 N. H. 244, 246. The charge given was as follows: "In estimating the probable expectancy of life of the child Bruce Humphreys, you are to take into consideration his age, health, physical condition and appearance of health of his parents. Of course, in determining what compensation should be given for the above factors, you should award only the present worth of any elements of damage."

The requests contained two important factors: (1) the fact that a child of tender age is not a source of pecuniary advantage to his parents; (2) the fact that the present award of full damages to be suffered in the future would place the beneficiaries in a better position than would be just. As to the first point the court used the phrase "capacity to earn money after reaching the age of twenty-one years." The form of words used called this point to the jury's attention only indirectly and with doubtful emphasis. They were hardly likely to understand a thought which probably was new to their minds. While as to the first point, the phraseology requested was the converse of what it should have been, it brought the question to the court's attention.

As to the second point, there was no sufficient explanation of the words "present worth." It is not to be assumed that average jurors have mathematical knowledge sufficient for an understanding of the words, or enough skill to calculate present worth. They are entitled to know that present worth of damages to be suffered in the future is such sum of money in hand as with a proper rate of interest compounded will yield the sum to be obtained at the conclusion of the period in contemplation. The rate of interest taken may be the average current rate according to standard investment practices. "In ascertaining the present worth of the future loss of earnings, that is, in discounting the recovery because future losses are paid for in advance, the rate of discount is based upon the current return upon long-term investments if the prospective losses are long continued." Restatement, Torts, s. 924 *d*.

If, in the discretion of the court, it seems better to obtain from the jury such special findings as may result in a fair computation, the court may require special verdicts as to (1) the probable expectancy of life of the decedent, of which there must be evidence if a

merely conjectural verdict is to be avoided; (2) the final amount in contemplation; (3) the proper rate at which a present sum may be compounded for the period. From these verdicts the present worth may be calculated by the court, or by an accountant appointed by the court, and become the basis of the judgment.

Neither method would appear to impair the constitutional right of the parties to have controverted facts determined by the jury. Either method would determine those facts with more certainty than is possible under the usual method, which invites the wildest guessing by the jury. The second method might usually be more satisfactory, since the isolation of the three factors suggested, with any others desirable in a particular case, would tend to disclose any patent error into which the jury might fall—a point of prime importance if the question of excessiveness of the award should be raised.

There should be a new trial at which one of the suggested methods should be applied, with such instructions as will fully explain to the jury the functions they are to perform. The motion to set aside the verdict needs no consideration. Nor need other exceptions be covered, since the questions involved are not likely to arise at another trial.

*New trial.*

All concurred.