Rockingham, Feb. 6, 1945. } No. 3510.

MABEL N. M. ADAMS, *Adm'x v.* WILLIAM W. SEVERANCE.

*William H. Sleeper* (by brief and orally), for the plaintiff.

*Hughes & Burns* (*Mr. Burns* orally), for the defendant.

PAGE, J. On the day of his death, the decedent had attended Superior Court in Portsmouth as a deputy sheriff. His wife, the plaintiff, accompanied him on the trip in his automobile. Because a fog set in, they started early for their home in Londonderry, doing some errands on the way. At about seven in the evening, after dark, the decedent came opposite his unlighted house, which was north of the road and to his right. Because of the dense fog, he failed to see his driveway and passed it, but being informed by his wife of his passing the house, he turned into the driveway of one Davenport, several hundred feet westerly of his own house. The Davenport house, like the Adams house, was on the right or northerly side of the road, but unlike it had lights that could be seen from the road.

The decedent backed out of the Davenport driveway, with the intention of turning east to his own house, but his rear wheels came to rest on some ice on the south shoulder of the road. The decedent vainly tried to drive forward, but his rear wheels spun on the ice, and the car remained at rest, with the front wheels somewhat to the east of the rear wheels, so that the Adams car effectively blocked the south side of the road. The plaintiff, when things were in this

situation, noted the veiled lights of the defendant's truck approaching from the west and warned the decedent, who got out of the car and ran westerly, swinging his arms above his head. After he had thus run 70 to 80 feet, as the plaintiff estimated, he ran back towards his car, still waving his arms. The last the plaintiff saw of him, he was standing at the westerly rear of his car, facing east, on the south side of the road.

The defendant did not see the decedent at all until after the accident. He saw the Adams car only when his own headlights illuminated it at a distance of thirty to thirty-five feet. He then applied his hydraulic brakes, with a booster helper, and swerved to his left. It could be found that the right running board of the truck collided with the left front bumper of the Adams car and swung the latter so that it headed into the snowbank on the south side of the road at a very acute angle. The head of the Adams car, in the course of this swing of about ninety degrees, traveled a measured distance of twenty-eight feet. The defendant's brakes locked at the point of contact and the head of the truck came to rest thirty-eight measured feet from the point of contact. Allowance being made for the point on the side of the truck that made contact, the truck traveled some thirty feet after the brakes locked. The decedent's body was found lying in or near the middle of the road about opposite the rear of his car as it finally came to rest. The defendant estimated that if his speed was thirty miles an hour, on a road slippery with slush, as this was, he could stop in some forty or fifty feet. He claimed that he approached the scene of the accident at only 12 to 15 miles an hour. The plaintiff estimated the defendant's speed at 30 to 35 miles an hour, but less than 35.

On the basis of the foregoing, the jury could disbelieve the defendant's estimate of speed. Since the collision was of sufficient force to overcome the inertia of the decedent's 3510-pound car, plus the plaintiff's weight, and throw it 28 feet in a 90-degree spin that ended only when the car ran into a snowbank, the checking of the defendant's progress must have been compensatory. The jury could with some reason infer that the defendant's speed was substantially greater than 15 miles an hour and approximated the thirty miles stated by Mrs. Adams, and they could find that such speed was unreasonable in view of the slippery road, and the defendant's testimony that he knew that there might be persons or vehicles in his path which his lights could not disclose until he was within 30 or 35 feet of them.

Even if no reasonable man could find that the defendant ought, if

alert, to have seen the decedent in his black clothing, or his black automobile, or the tail-lights of the latter, because buried in the snowbank (as to which no opinion need be expressed), it could plainly be found that the defendant, if watchful, would have seen the halation of the Adams headlights at such distance that he could have taken saving action. It was uncontroverted that the lights in the Davenport house could be seen from the road, a distance of over 100 feet. While the upper halves of the headlights were painted in accordance with wartime dimout regulations, the jury could find that a driver of average prudence and attention would have seen the halation in the fog of the depressed headlight beams (at whatever angle according to the testimony the Adams car sat in the road) much further away than the 30 or 35 feet at which the defendant saw the car itself in the light cast from his own car. He never saw the lights from the Adams car until after the accident. He could clearly be found to have been causally negligent.

The defendant asserts, however, that the decedent was causally negligent because he took a dangerous position in the road. But the jury could find that he acted as a man of average prudence in standing near the rear of a car whose headlights showed that it blocked the south lane of the road. It is further asserted that both the decedent and the plaintiff were causally negligent because no use was made of an electric torch in a cupboard in the Adams car. Mrs. Adams admitted that she never thought of the flashlight and wished that she had. Whether either she or her husband should have thought of it and used it and whether its use would have avoided the collision in view of the findable inattention of the defendant were all questions for the jury, and as to them the defendant had the burden of proof. The motions for a nonsuit, for a directed verdict, and to set the verdict aside as against the evidence and the law were all properly denied.

The motion to set the verdict aside as excessive requires separate consideration. The decedent was seventy years and six months old. His expectancy of life, according to tables introduced, might be found to be slightly over nine years. His estate is entitled to a verdict for the present value of what he would have earned for his sole dependent, Mrs. Adams, and for his estate, had he lived the rest of his natural life. *Humphreys* v. *Ash,* 90 N. H. 223. He had certain earnings that are not questioned. He was a deputy sheriff, as which he earned $45 in 1942. He was a selectman of Londonderry, as which he received in 1942 the sum of $181.25. As moderator of the

town meeting he had $8. For the County Conservation Association his work in five months of 1942 brought him $88.85. He did some business as an insurance agent, earning $76.79 in 1941 and $79.81 in 1942. In all, these earnings came to about $400 annually. Beyond this, he had the produce of his farm. The net profit of his strawberries in 1942 did not appear, but in 1943 the net yield was $305.90. The 1943 apple crop showed a net gain of $849.05, after a charge for picking and trucking of $302.80, and it might fairly be supposed that the picking charge would have been decreased by Mr. Adams' own labor if he had lived. So, also, perhaps as to the spraying charge, as it appeared that Mr. Adams and a neighbor shared a sprayer between them. Though it was in evidence that the price of apples in 1943 was twice what it was in 1942, the normal net return from the orchard could reasonably have been figured at several hundred dollars. Besides the fruit, there was an expectable yield of 45 tons of hay, and the decedent had a garden from which he sold truck for a profit not known. Altogether, the jury could reasonably find that net annual earnings from the farm were probably about $1,000 a year, besides the $400 of outside earnings not disputed. Included in this would be the food raised on the farm and consumed at home. The verdict was not so clearly excessive that it must be set aside, even though it might be thought to approximate the maximum allowable on the evidence.

Another particular ground for the motion to set aside the verdict, aside from the defendant's requests for instructions and the limitation of issues, which are later to be considered, was the asserted disqualification of one of the jurors, George H. Robinson. When asked whether he employed either counsel engaged in the trial of the case in some pending matter, the juror answered, with strict truth, in the negative. Mr. Sleeper, counsel for the plaintiff, was at the time attorney of record for the juror's wife, who was executrix and residuary legatee under the will of Ira E. Quimby. There was on the Rockingham docket at the time of the trial an appeal from the allowance in solemn form of the Quimby will. The Presiding Justice refused to set aside the verdict on this ground, though he said that if he had known all of the facts he would have excused the juror, but he added, "it is not in my opinion sufficient to set aside the verdict at this time." If the juror was disqualified as a matter of law for interest, or if he had been "improperly and unfairly allowed to serve," the verdict should have been set aside. *Shulinsky* v. *Railroad*, 83 N. H. 86, 89. The juror had no interest in the case on trial.

As to his wife's will case, in which Mr. Sleeper appeared, that must be assigned its real position as of December 7, 1943, the day the trial of the case began. Already, on November 15, 1943, an agreement for the settlement of the will case by the interested parties had been filed in the papers of the Court. No more remained than for a final formal marking to be made consonant with the agreement of November 15, and that marking ("dismissed") was made on December 15, 1943. If it could be said that the juror had any disqualifying interest in his wife's case, that case was in all substantial respects no longer pending on December 7, when the juror was impanelled, and it cannot be said as a matter of law that he was disqualified, no matter how cautious the Presiding Justice might have been about excusing him if he had known all of the facts.

The defendant excepted to the denial of his motion to withdraw from consideration by the jury the testimony of Draper Parmenter concerning the expectable income from the operation of the Adams farm, on the ground that it was remote and speculative, and that it permitted the jury to guess or surmise. The witness testified as to the actual net income during 1943 from strawberries and apples. That was not possibly either remote or speculative. Further than that the witness testified (and no question was at the time raised as to his qualifications to do so) as to his estimates of the expectable gross yield of the farm and of the cost of labor such as Mr. Adams would require, which indicated a "gross net" yield of something over $1,200 a year. He testified that there would be some little further expenses. He admitted that, as Mr. Adams actually operated the farm, the net profit would be "low," but he added that aside from the money value, "A man has to live somewhere and he had residence and so forth," which with other words soon to be quoted indicates that the witness had in mind the family consumption of home-grown products. The witness frankly said that he would hate to be held to dollars and cents, but when asked whether from a practical point of view he would want to put much reliance upon his computation, he replied, "No, but it could not be much lower than that. The man lived." The testimony was not too remote to be useful to the jury, and it did not leave the jury to a mere guess. Within its more or less generalized framework, there was material for reasonable inference, and it was, even if no more, useful for checking against proof of incomplete net farm income of over $1,100 in 1943.

The defendant excepted to the testimony of Mrs. Adams that the flashlight was not always in the car and that she was the one who

generally took it out and put it back. The testimony was properly received, since it bore upon Mr. Adams' knowledge and his occasion to think of the light. That the testimony tended to charge Mrs. Adams' memory, was a point of which the defendant has no occasion to complain. The defendant further excepted to Mrs. Adams' testimony concerning the manner of opening the compartment in which the light was, and whether or not the compartment was locked. If the jury thought that either of the Adamses should have thought of the flashlight, the testimony might be useful for a determination of the fact whether the failure to think was causal of the accident.

After the decedent's death, Mrs. Adams applied to E. B. Weston, an attorney, for help in making out the decedent's income tax return for 1942. She testified that one was made, but that it was incomplete. She at first said that she mailed the incomplete return to the collector of Internal Revenue. Defendant's counsel demanded a copy of the return, but Mrs. Adams had none. Subsequently Mrs. Adams went to the collector's office to get a copy, but she was told that it was contrary to the law to give her one. Two witnesses employed in the collector's office appeared and testified that no copy of a return could be lawfully produced in court, but if Mrs. Adams had made a return, she could herself have access to it in the collector's office and make a copy of it. Their testimony left it in doubt whether any return had been made by Mrs. Adams, but did not wholly eliminate the possibility. Mrs. Adams was recalled. Without objection or exception, she testified that she might have been mistaken about mailing the incomplete return. Later Mr. Weston took the stand and his testimony threw further doubt about the sending of the return. His testimony tended to show a reason for not sending the return, and this portion of his testimony went in subject to exception. The objection now made to it is the "flimsy excuse offered" for the failure to file "after Mrs. Adams had testified positively that she had filed one." As defendant's counsel had permitted her without objection to throw doubt upon her first statement, there is no basis for the later claim that the situation permitted no explanation.

Mrs. Adams was asked to give her opinion as to the speed of the defendant's truck. She had already answered certain questions concerning her qualifications to give an opinion. The defendant objected generally to her stating it. The Presiding Justice said: "Question may be answered. I will let the jury determine her qualifications." A general exception was claimed and allowed. What

the record means seems to us doubtful. The defendant says that the Court did not pass upon the qualifications, but left them to the jury, contrary to *Ricard* v. *Company*, 87 N. H. 31, 33. But the permission to answer may as well presuppose a finding by the Court that the witness was qualified to give some help to the jury, but how much she was qualified to help them was for them to determine in the weighing of her testimony. Since the defendant did nothing to clarify the record, he may not take advantage of the doubt.

A state trooper who investigated the accident was asked by the defendant's counsel whether with the Adams car at the angle indicated by the marks made by the spinning rear wheels and with the upper half of the headlights painted black, there would in his opinion be a tendency to deflect the rays of the headlights down. On objection that the opinion of the witness could not aid twelve practical men, the question was properly excluded. The jurors' common knowledge would suggest the obvious answer.

The same witness was asked whether Mrs. Adams told him why Mr. Adams got out of the car. The question was excluded and the defendant excepted. Aside from the fact that the question called for hearsay and was not offered in contradiction of matters concerning which Mrs. Adams had been examined in detail, it was properly excluded in spite of other grounds alleged for its admission. It is claimed that the question bore on the fact whether Mrs. Adams had stated to the trooper that Mr. Adams had or had not been able to move the car after it became "stranded." But the witness had already stated clearly that Mrs. Adams did not say one way or the other, so the claim now made has no substance.

The defendant excepted to the denial of a request that the Court submit to the jury questions for special verdicts as to the decedent's probable expectancy of life, the final amount contemplated by the jury as damages, and the probable rate at which the present value should be computed. The Presiding Justice properly ruled that it was in his discretion whether to submit these special issues (*Humphreys* v. *Ash*, 90 N. H. 223, 230), and properly told defendant's counsel that he had no exception, by which we understand that the Court meant that his exercise of discretion would not be reviewable here except in case of its abuse, of which the record discloses no suspicion.

The defendant excepted to the allowance of the argument by plaintiff's counsel that the distance that the truck traveled after application of the booster brakes to the dual wheels indicated that the speed of the truck was 30 to 35 miles an hour, as claimed by Mrs.

Adams rather than 12 to 15 miles an hour as claimed by the defendant. The fair basis of this argument appears from the earlier discussion of speed in this opinion.

An argument by plaintiff's counsel that this was one of the percentage of accidents caused by speed was objected to by the defendant. The jury were told to pay no attention to it, and it was withdrawn. There is no presumption that the jury were unduly prejudiced by it, even if it was improper.

Other portions of the argument by plaintiff's counsel were excepted to, but none of them transgressed fair comment upon the evidence.

The defendant brings up sixteen exceptions to the denial of requests for instructions. They may be disposed of shortly in groups. Numbers 1, 21 and 26 have been disposed of by things said earlier in the opinion. Numbers 7, 8, 9, 11, 16, 18, 22, 23, 24 and 25 were given in sufficient substance by the Presiding Justice, and should never have been urged here. The one concerning the failure of the defendant to sound his horn (No. 13) was properly denied, because no issue was raised in that respect. The state of the defendant's testimony precluded the giving of No. 12, to the effect that the defendant was not required to anticipate the presence of the Adams car.

Request No. 14 was that there was no presumption that Mr. Adams was in the exercise of due care at the time of the accident by reason of the instinct of self-preservation. The defendant relies, in arguing his exception to the denial of this request, upon *Smith* v. *Railroad*, 87 N. H. 246, 265. That case, in turn, is supported by *Greenwood* v. *Railroad*, 77 N. H. 101 and by *Wright* v. *Railroad*, 74 N. H. 128. In all those cases, the decedent was killed by a train running upon a track where the decedent was. In neither of them was there any explanation as to the reason why the decedent failed to anticipate the approach of the train or to get out of the way of it. In such a situation, the defendant was entitled to a warning that the only reason possibly assignable, to wit, the instinct of self-preservation, was not available to the plaintiff. The case before us is not one calling for any thought of the instinct of self-preservation. The actions of the decedent have all been testified to in some detail. We know that he was aware of the approach of the truck and what he did about it. When he took his final position, the only question was whether it could be found that he took reasonable care. He was in a different position than the man on the railroad track, whose single chance for safety is to step out of the only way in which the train can proceed and whose representative may not leave the jury to guess

that his failure to get off the track was careful because of the supposed instinct of self-preservation, which is the only possible evidence of care. As Mr. Adams stood beside the rear wheel of his car, the only question for the jury was whether he was reasonably careful in doing so. They could consider the reasonableness of hope that the defendant would see him, or his car, or the lights from his car and avoid him by turning to the left as the engineer of a train could not. They could consider whether Mr. Adams should have moved into the north lane and risked being hit there. They could consider whether he should have anticipated that his car would have been hit by the truck and spun around so as to injure him, and in this connection they could bear in mind that a collision was nearly avoided. Whether or not, if he foresaw such a contingency, he should have jumped over the snowbank on the south side of the road, or had time to do so, was for the jury. With all these factors to consider with respect to the decedent's care, the jury did not need to be told that the finding of his due care could not be rested solely on the instinct of self-preservation.

The defendant brings up six exceptions to the charge as given. Three of them require no discussion other than what we have already given. The defendant excepted to the failure to charge the last clear chance doctrine as against the plaintiff. The defendant never clearly asked the Court to charge the last clear chance doctrine as against the plaintiff.

The defendant excepted to a charge that recoverable damages included not only what the decedent would probably leave from his earnings for his sole beneficiary, Mrs. Adams, but also what he would do for her from his earnings while living, after deducting his own living, but not hers. The exception is worthless. *Morrison* v. *Railroad*, 86 N. H. 176, 182. The same may be said of the exception to the charge that the jury might determine the rate of interest to be used in discounting the verdict to present value. Though no evidence was introduced as to the average current rate according to standard investment practices (*Humphreys* v. *Ash*, 90 N. H. 223, 230), the jurors may be assumed to have had common knowledge as to savings bank rates and the rates at which towns are able to borrow. *Roussin* v. *Blood*, 90 N. H. 391, 393. And popular drives for the sale of United States Government bonds have by now created a common knowledge as to the rate of interest current on such bonds.

*Judgment on the verdict.*

All concurred.