## Gregorius, Appellant, v. Safeway Steel Scaffolds Company, Appellant.

Argued October 9, 1962. Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN, O'BRIEN and KEIM, JJ.

*P. J. McArdle,* with him *Frank J. Kernan,* for plaintiff.

*Hamilton A. Robinson,* with him *Dickie, McCamey, Chilcote & Robinson,* for corporate defendant.

*Wallace E. Edgecombe,* with him *Royston, Robb, Leonard, Edgecombe & Miller,* for individual defendant.

OPINION BY MR. JUSTICE EAGEN, January 21, 1963:

The plaintiff was seriously injured in the course of his employment through the use of defective equipment. furnished his employer by a third party. He instituted this action for damages against the supplier of the equipment. The latter joined plaintiff's employer as an additional defendant. At trial, the jury awarded plaintiff a substantial verdict against the original defendant. The additional defendant was exonerated by the jury. Post trial, the court below directed a new trial between the plaintiff and the original defendant, limited to the question of damages. From this order, the plaintiff appeals. The original defendant appeals from the orders of the court denying judgment in its favor notwithstanding the verdict and refusing to direct that the additional defendant be a party to the second trial.

The factual background of the accident may be capsuled thusly:

The plaintiff is a painter by trade and was directed by his employer, Harry Weber, the additional defendant, to assist in painting the interior of a church for which Weber had the contract. The scaffolding equipment was furnished and erected by the original defendant, Safeway Steel Scaffolds Company of Pittsburgh, a corporation.

The equipment consisted, in part, of towers extending into the air, approximately 37 feet from the floor. These were connected by walkways, consisting of two "picks" running from one tower to another. Each "pick" was 22 feet long, 1 foot wide, made of wood with slats as the walking surface, supported by rungs underneath which doweled into the side rails. Each side rail was reinforced with a steel rod running lengthwise.

The domed contour of the walls and ceiling of the church was such, that it was impossible to reach and paint every portion thereof from the deck or platform of the towers or the walking surface of the "picks." The position of the congregational pews on the floor of the church rendered it impossible to move the towers.

In order to reach one of these difficult or inaccessible portions of the church interior, the plaintiff and a fellow employee moved a "pick" onto the deck of the tower and projected it out approximately 4 to 5 feet in the direction where the work had to be done. It was then securely tied down to the steel framework of the tower on the work side, while plaintiff's fellow employee sat on the "pick" at the opposite side of the tower in order to hold the "pick" firm. At this juncture, the 22 foot "pick" projected out 4 or 5 feet on the side where plaintiff was working, with 7 feet of its length supported by the tower itself and with 10 feet

extending out on the opposite side of the tower. When the plaintiff stepped out 2 or 3 feet on the projected portion of the "pick" to paint, it suddenly snapped off and he was plummeted with great force to the floor and pews beneath. He suffered painful and very serious permanent injuries.

A subsequent examination disclosed that several of the "picks" furnished by the original defendant were in a very defective condition. The particular one causing plaintiff's fall had been split some time before at the point of fracture involved herein, it being evident that a saw cut had run a half inch deep into the side rail at this point.

## Judgment n.o.v.

The original defendant admits that the evidence is amply sufficient to support the finding by the jury that it was guilty of negligence. The only contention raised on appeal in favor of its motion for judgment non obstante veredicto is that, under the facts, the plaintiff was guilty of contributory negligence as a matter of law. With this position, we cannot agree. The question was for the jury.

Certain appropriate principles of law are fundamental: (1) That the jury winner is entitled to every fact and inference of fact which may reasonably be deduced from the evidence, *Metro v. Long Transportation Co.*, 387 Pa. 354, 127 A. 2d 716 (1956); (2) That the question of contributory negligence should not be taken from the jury's consideration except in a clear case and only where the contributory negligence is so clearly revealed that reasonable minds cannot legitimately differ as to the conclusion of its existence: *Chicago Express, Inc. v. Robson,* 405 Pa. 207, 174 A. 2d 846 (1961); and, *Greco v. 7-Up Bottling Co. of Pitts.,* 401 Pa. 434, 165 A. 2d 5 (1960); (3) One does not have to anticipate that another will negligently cause him

injury, in other words, he is not bound to guard against lack of ordinary care on the part of another, *Schofield v. Druschel,* 359 Pa. 630, 59 A. 2d 919 (1948) ; *Fleischman v. Reading,* 388 Pa. 183, 130 A. 2d 429 (1957) ; and, *Mutter v. Slaymaker,* 404 Pa. 369, 171 A. 2d 779 (1961).

In the instant action, the plaintiff had every reason to rely upon the fact that the original defendant had furnished equipment in good condition, which was reasonably safe for the purpose of performing the job to be done. The day of the accident was the very first occasion he had cause to use it. The lighting in the church furnished by chandeliers, which hung far below the heighth of the temporarily erected towers upon which the plaintiff was working, cast their light downward towards the floor. The fact that he did not see or observe the existing defect in the particular "pick" is readily understandable. To expect him to do so would be unreasonable.

It is argued that the particular use made by the plaintiff of the "pick," which broke and caused the fall, constituted a dangerous adventure and that he voluntarily assumed the risk of the consequences that followed. The answer to this is that the particular use of the "pick" made by the plaintiff at the time of the accident was not unusual, but rather the customary and the usual practice followed by other such tradesmen in like situations. Several witnesses testified to this fact. Not one offered contradiction. This is what is known in the trade as a "thrustout." The Department of Labor and Industry of the Commonwealth recognizes that such a practice is followed, as is indicated by a provision in relation thereto in its Regulations for Construction and Repairs. These regulations provide for the use of life belts and life lines where workmen "crawl out on thrustouts" or projecting beams. However, the evidence was unanimous in this

case that, under the prevailing conditions, the use of these safety measures would be impractical and imperil rather than insure the safety of the plaintiff.

In determining the standard of conduct of one who is injured in the performance of his employment, the working conditions and all of the circumstances incident thereto, including his obligation to do his job, must be considered: *Stringert v. Lastik Products Co., Inc.,* 397 Pa. 503, 155 A. 2d 625 (1959). If in performing his employment, a workman conforms to the ordinary usage thereof, this is evidence of the exercise of due care and indicates lack of careless conduct: *Mutter v. Slaymaker,* supra. As stated in *Van Zandt v. Phila. B. & W. R. R. Co.,* 248 Pa. 276, 93 A. 1010 (1915), at 281: "What is required of the workman is that he exercise care for his safety according to the circumstances. He knows he is occupying a place of great danger and his care must be commensurate with that danger. He is equally cognizant of the fact that he must perform faithfully the services required of him. Both obligations are resting upon him, and each must be met with a due regard to the other."

### New Trial

In instructing the jury as to the claim for loss of impairment of future earning power, the court stated that in reducing this element of damage to its present worth, the jury was permitted to use a measure other than the prevailing legal rate of interest. In other words, the court allowed the jury to select its own rate of interest in calculating this sum. This instruction was influenced by a specific request on the part of plaintiff's counsel. Unfortunately, these instructions are contrary to the rule enunciated by this Court in *Windle v. Davis,* 275 Pa. 23, 118 A. 503 (1922), wherein at page 29, we said: "A jury must compute damages

according to law, not merely to their own satisfaction, and when passing upon the question of future damages they can allow, as the present worth, such sum only as put at simple interest will, with the accumulations of interest, amount to such damages at the time or times in the future when the jury find from the evidence they will be sustained. *Moreover, the interest must be computed at the lawful rate of six per cent:*[1] See 17 Corpus Juris 906." This rule was at least inferentially reaffirmed in *Stark v. Lehigh Foundries, Inc.,* 388 Pa. 1, 130 A. 2d 123 (1957); and *Sherman v. Manufacturers L. & H. Co.,* 389 Pa. 61, 132 A. 2d 255 (1957).

The lower court recognizing that the trial instructions in this respect were contrary to the rule of *Windle v. Davis,* supra, and further that the element of diminution of earning power constituted a major element in the case, held that this portion of the charge was erroneous and required a new trial. This was the sole reason stated for such action.

It is argued by the plaintiff that the rule enunciated in *Windle v. Davis,* supra, in view of economic conditions, is antiquated and unrealistic in modern times. We are all aware that present interest rates are different than as of the year this rule was first written. In fact, they presently vary from day to day, place to place, and under different conditions in the same area. There must be a fixed rule to aid juries in calculating the present worth of such elements of damage and to guide trial courts in aiding the jury in resolving such difficult questions. It is our conclusion that a change in the rule would lead only to confusion and chaos and add greater difficulty in the trial of such cases. The rule is, therefore, reaffirmed.

---

[1] Emphasis supplied.

We thoroughly agree with the conclusion of the lower court that the jury was completely justified in exonerating from liability the additional defendant, Weber. There is no good reason why this issue should be retried.

The orders of the lower court are affirmed.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

The plaintiff in this case sustained frightful injuries. Although he still bears the form of man, he has been deprived of much of what makes a man: unimpaired mobility, normal vision, cerebral integrity, nerve wholeness, auditory soundness. His earning power has been permanently destroyed. He is deformed and awkward. He can no longer romp with his children.

The jury returned a verdict in his favor in the sum of $210,675, a modest figure when one sees Francis Gregorius, as he is today, and as he must have been before the fateful accident which caused him to plunge from a scaffolding where he was painting the ceiling of a church down to the sharply penetrating backs of pews 37 feet beneath.

The trial court ordered a new trial not because of any doubt as to the extent of his injuries or that per se the verdict was excessive. It ordered a new trial because in charging the jury it said that the jury should reduce the present worth of whatever amount was allowable for reduction in earning power by the rate of interest currently obtainable. The court declared this instruction was in error, citing *Windle v. Davis*, 275 Pa. 23, where this Court said, back in the lush days of 1922: "A jury must compute damages according to law, not merely to their own satisfaction, and when passing upon the question of future damages they can allow, as the present worth, such sum only as put at

simple interest will, with the accumulations of interest, amount to such damages at the time or times in the future when the jury find from the evidence they will be sustained. Moreover, the interest must be computed at the lawful rate of six per cent." (Emphasis supplied.)

Everyone knows that obtaining a return of 6% on one's money today is like growing watermelons in the Sahara. It is possible but highly unlikely, without the aid of experts whose cost could drain away the profit, making the venture a wholly dessicated investment.

If law is to be a living, breathing vital force, responding to the needs and conditions of the present, as it is eulogized at all bar association dinners and festivities, it cannot be predicated on decisions which no longer represent reality. To require a jury to reduce by 6% the amount to which the plaintiff in this case is entitled is to take away from him a sizeable portion of his verdict because he could not, without the financial skill, which the record in no way attributes to him, obtain 6% on what he is entitled to in this lawsuit.

When this Court said in 1922 that 6% was the lawful rate of interest, it did not say that 6% was and would for all time remain the routine, usual interest. Twenty years after the *Windle* decision this Court held that a 6% yield on an investment was not only not usual but that to depend on 6% constituted shaky financing. We said in *Kenin's Trust Estate*, 343 Pa. 549, 566: "We take judicial notice of the fact that during the period of this detention, money could not be *safely* invested so as to yield a return of six per cent a year, and that if the Trustee had delivered the proceeds of the insurance policies to the Trustees under the will and the latter had followed the testator's directions 'to hold and invest the same and keep the same safely invested' the investments would not have yielded more than 2½% a year." (Emphasis supplied.)

The lower court's opinion and the majority opinion speak of a 6% return on investments as if the 6% flag were flying over every bank, building and loan association and broker's establishment. As a matter of fact that flag has been at half mast for many years and for a long time following the crash of 1929 it scarcely got above the roof and for years could not manage to reach higher than a third of the way to the top of the flagpole. Justice MAXEY (later Chief Justice) said illuminatingly in *Kenin's Trust Estate*, supra, "There is no statutory requirement that damages for the detention of funds be measured by the legal rate of interest for the period of the detention. That such damages have often been thus measured was due to the fact that under the normal investment conditions prevailing (except for brief intervals) during the period ante-dating 1929, a just charge for detention was 6% per annum. This was apparently the situation in the cases above cited."

To compel the plaintiff here to look for investments bringing a 6% return on what the jury awards him for loss of future wages is to ask him to attach skates to his disabled feet and, on wobbly legs, strike out over thin ice to seek a solid island of guaranteed returns while moving over a constantly cracking surface beneath him. The tortfeasor in this case already caused him to fall once, the Court should not force him into a situation where he may fall again—this time into a hole in the ice where he may lose *all* that an appreciative and fair-minded jury gave him for the necessities and slight comforts of a life which must from now on be clouded with unhappiness, at its best.

The lawful rate of 6% interest in Pennsylvania was established to protect people inexperienced in the ways of the world from the wolves of finance who might inveigle the unwary into the jaws of usurious destruction. The law never proclaimed that once money was

put to work, it would of itself automatically augment yearly by 6%. Courts have no way of controlling markets, exchange, buying and selling any more than they can by decrees guarantee rain and abundance of harvests to the farmer.

The majority opinion does not attempt to rationalize the application of the 6% rule. It merely says that it was established by the case of *Windle v. Davis,* supra, and it must be followed. I refuse to accept *Windle v. Davis,* supra, as representing the last word in wisdom, or even the first word in fairness. While I believe in adherence to the principle of stare decisis, I see no wisdom or even good sense in following a rule which is palpably incorrect and clearly works injustice. The road sign which points straight ahead when straight ahead leads to an unrailed precipice should be ignored, and either the sign should be changed or the road rerouted to avoid the precipice.

The decision of this Court puts up a road sign which Gregorius could well ignore because if he indiscriminately invests his verdict at a presumed 6% he takes a chance of going over the precipice which will smash his investments to a greater degree than the fall in the church smashed his body.

The majority opinion says that "There must be a fixed rule to aid juries in calculating the present worth of such elements of damage and to guide trial courts in aiding the jury in resolving such difficult questions."

This may or may not be true, but there certainly is no principle of law which says that a fixed rule should embody something which is unreal. To speak of a 6% return on the average investment of today is to dwell in a land of unreality, day-dreaming and vain hope.

The majority opinion says that a "change in the rule would lead only to confusion and chaos and add greater difficulty in the trial of such cases."

I do not agree with this conclusion. Jurors are more aware of what is happening in the current world than the majority gives them credit for. With the media of mass communication prevalent today—newspapers, radio, television, billboards—all of which proclaim the rates of interest payable by banks and investment houses, the average juror more thoroughly knows what is happening in the world of finance than even bankers could constantly know when the *Windle* case broke on the horizon of an uninformed public.

The majority opinion, following *Windle,* speaks of 6% as the lawful rate of interest. In many ways it is really unlawful. No bank insured under the Federal Reserve System is authorized to pay more than 3% interest, compounded quarterly. No savings bank, whether insured under the Federal Reserve System or not, may pay depositors over 5% interest in Pennsylvania. The Treasurer of the United States is not allowed to pay above 3.26%, compounded semi-annually on United States Savings Banks, unless the President, for national reasons, raises the rate and even then, he may not increase it above 4.25%.

Even the Restatement of Torts contradicts the majority opinion. It says under comment d, Section 924: "In ascertaining the present worth of the future loss of earnings, that is, in discounting the recovery because future losses are paid for in advance, the rate of discount is based upon the current return upon long-term investments if the prospective losses are long continued."

Former Chief Justice HORACE STERN commented cogently on this subject in his dissenting opinion in *Murray v. Phila. Trans. Co.,* 359 Pa. 69, 79: "the majority opinion states that in reducing the amount recoverable to its present worth the reduction should be on the basis of the legal rate of interest, citing in support of this pronouncement Windle v. Davis, 275 Pa.

23, 29, 118 A. 503, 505. That case cites as its authority 17 C. J. 906, which in turn refers solely to the case of Central of Georgia Rwy. Co. v. Mosely, 112 Ga. 914, 38 S.E. 350. I cannot see any logical connection whatever between the maximum rate of interest which the law allows a creditor to charge and the amount of return which an investor can obtain on reasonably safe securities. The effect of the rule now being laid down is not only unrealistic (for everyone knows that any proceeds that may be recovered in this case cannot be safely invested on the basis of a 6% return) but it sharply diminishes the amount recoverable no matter which rule as to the measure of damages be adopted. It seems to me obvious that the discount computation should be made in accordance with the actual earning power of money, namely, the current rate of return on sound investment; see Restatement, Torts, §924, comment d."

Other members of this Court have manifested dissatisfaction with the 6% rule which the majority affirms. In *Sherman v. Manufacturers Light & Heat Co.*, 389 Pa. 61, 70, Justices MUSMANNO and ARNOLD called upon this Court to overrule the *Windle* case. We said: "We should retire Windle v. Davis because it proclaims a financial criterion which has long ago been repudiated on the Rialto. There was a time, of course, when money was a very lively plant in a fertile soil. It only had to be watered with reasonable care and it would bloom with 6% and even higher rates of interest. In 1929 that plant suffered a blight from which it never thoroughly recovered. To speak today of 6% on bank deposits and other guaranteed, safe investments is to indulge in day-dreaming. Today it takes exceeding financial skill or extraordinary luck to produce a 6% ipso facto return on a given investment, and it is contrary to all demonstrated fact to assume that the average plaintiff in a personal injuries case

possesses unusual talents in financial divination. Nor is it in keeping with our concept of fair dealing to subject him to the law of chance in obtaining what is his by operation of the law of the land.

"I regard it as unfair, unjust, and inequitable to take from an injured man's verdict an amount equivalent to 6% when at most he might get only a return of 2 or 3% on his investment. Imposing the rate of interest laid down in the Windle case means actually taking from the injured man's pocket at least 3% of the amount the law has awarded him. This 3% is not a tax which goes to the government, it is not charity payable to a hospital, it represents an amount of money turned over to the defendant—the very person who has injured the plaintiff, crippled him, and inflicted on him pain, suffering, and agony. If this is justice, it has indeed taken a strange and enigmatic form.

"This Court had the opportunity in this case, which it entirely ignored, to definitely declare what the law should be *today* on the matter of deductible interest in personal injury damage cases. I submit that this Court should have announced that whatever amount the jury is to award the plaintiff for prospective loss of future earnings should be translated into that amount which when invested at the *prevailing rate of interest* (which is certainly not 6%), would equal at the end the total accumulation of all future losses resulting from impairment or complete destruction of earning power."

The Supreme Court of the United States does not go along with the fantasy that a 6% return is inevitable on investments. In *Chesapeake & Ohio Ry. Co. v. Kelly*, 241 U.S. 485, 490, it said: "We do not mean to say that the discount should be at what is commonly called the 'legal rate' of interest; that is, the rate limited by law, beyond which interest is prohibited. It may be that such rates are not obtainable upon investments on safe securities, at least without the exercise of fi-

nancial skill in the administration of the fund; and it is evident that the compensation should be awarded upon a basis that does not call upon the beneficiaries to exercise such skill, for where this is necessarily employed the interest return is in part earned by the investor rather than by the investment. This however is a matter that ordinarily may be adjusted by scaling the rate of interest to be adopted in computing the value of the future benefits; it being a matter of common knowledge that, as a rule, the best and safest investments and those which require the least care, yield only a moderate return."

Other courts in the United States tread the solid ground of reality and do not assume to be true what common experience establishes to be untrue. The Supreme Court of Florida said in *Renuart Lumber Yards v. Levine* (Fla.), 49 So. 2d 97, 98, "In some decisions this Court has, without discussing the matter in detail, employed the legal rate of interest. While it appears that a number of courts have adopted the legal rate of interest for this purpose, the better rule does not restrict the jury to the legal rate of interest but leaves to the jury within reasonable limits the discretion of applying such rate of interest as it finds to be just and fair under the circumstances."

In *Thoirs v. Pounsford*, 210 Minn. 462, the Supreme Court of Minnesota said: "But ordinarily the computation should be based on the rate of interest available on safe investments."

The Supreme Court of Iowa said in *Von Tersch v. Ahrendsen*, 251 Iowa 115, 122: "The contention that the legal rate of interest should be used in reducing the loss of future earnings to their present value and not the rate for safe investments in the locality is without merit."

The Supreme Court of Washington in *Kellerher v. Porter*, 29 Wash. 2d 650, 676, said: "In our opinion the

trial court . . . should further advise the jury that it should use as the discount rate that rate of interest which, in its considered judgment, is reasonable, just, and right under all the circumstances, taking into consideration the evidence presented, the jury's knowledge of the prevailing interest rates within the limits prescribed by law in that area, and what rate of interest could fairly be expected from safe investments which a person of ordinary prudence, but without particular financial experience or skill, could make in the locality."

The Supreme Court of New Hampshire said, in the case of *Adams v. Severance*, 93 N.H. 289, 298: "Though no evidence was introduced as to the average current rate according to standard investment practices (Humphreys v. Ash, 90 N.H. 223, 230), the jurors may be assumed to have had common knowledge as to savings bank rates and the rates at which towns are able to borrow. Roussin v. Blood, 90 N.H. 391, 393. And popular drives for the sale of United States Government bonds have by now created a common knowledge as to the rate of interest current on such bonds."

In the face of the logic, justice, and fairness embodied in these decisions; in view of what cannot be denied, namely, that 6% interest is *not* the prevalent rate of interest; in a just appraisement of fact and not theory, reality and not abstraction, it is incomprehensible to me how the majority can do so unjust a thing as to require the plaintiff in this case to surrender up much of what was properly awarded him by the jury and which, considering the nature of his terrible injuries, is really a modest sum. I thus dissent to that part of the majority's decision which orders this wholly unnecessary new trial. I concur in that part of the majority opinion which states that the question of contributory negligence was properly decided by the jury and that the additional defendant was without fault.