## Sherman, Appellant, *v.* Manufacturers Light and Heat Company.

Argued November 14, 1956. Before STERN, C. J., JONES, BELL, CHIDSEY, MUSMANNO and ARNOLD, JJ.

*Elder W. Marshall,* with him *Gilbert J. Helwig, Mayer Sniderman* and *Reed, Smith, Shaw & McClay,* for appellant.

*Samuel W. Pringle,* with him *Pringle, Bredin & Martin,* for appellee.

OPINION BY MR. JUSTICE BELL, May 27, 1957:

Plaintiff was injured on *February 12, 1952,* in a collision between the automobile he was driving and a truck of the defendant company. The questions of negligence and contributory negligence were vigorously contested. The jury rendered a verdict in favor of plaintiff for $22,000. Plaintiff sought a new trial because of alleged errors in the charge of the Court, and because the verdict was inadequate. A new trial was refused. Plaintiff has appealed from the judgment entered on the verdict.

Plaintiff was a vigorous young man 27 years of age at the time of the accident. For about a month after the accident he was treated by his family physician, Dr. McDivitt, for shock and pain in the lower back and lumbar region. From *March 27, 1952* until *October 1952, Dr. Steele,* an orthopedic surgeon, treated the plaintiff, prescribing heat and massage and the use of a belt. In October 1952, Dr. Steele took a myelogram, i.e., an X-ray of the spinal cord, which disclosed that plaintiff was suffering from a ruptured intervertebral disc. Dr. Steele subsequently recommended surgery. On January 23, 1953, an operation for this condition was performed upon plaintiff at the Veterans' Administration Hospital in Aspinwall. Plaintiff was discharged from the hospital on *January 31, 1953.* Although he sought no further medical care until *January 1955,* he testified that he continued to have severe pain in his lower back and right leg after April 1953.

On January 26, *1955,* plaintiff saw Dr. Faix, a specialist in general and orthopedic surgery, and Dr. McCabe, a neurologist. A second myelogram was taken and Dr. Faix concluded that either all of the disc had not been removed during the operation in January 1953, or a recurrent disc had formed. Dr. McCabe testified that plaintiff had suffered permanent injury to his nervous system which would cause him severe pain throughout the rest of his life. Plaintiff testified that he worked on and off after the accident and earned approximately $2,000., but he was not able to continue to work at any of the jobs he obtained because of his pain and physical condition.

Defendant not only denied negligence and alleged that plaintiff was guilty of negligence and contributory negligence, but also introduced medical testimony which was almost diametrically opposed to that of the plaintiff's. Defendant called as its medical witness, Dr. Steele, who was *plaintiff's* orthopedic doctor after the accident. Dr. Steele testified that in his opinion plaintiff's condition was caused by tuberculosis of the spine, and this condition had been arrested and would gradually improve, so that in about 2 or 3 years he could do an ordinary job which required only ordinary physical effort.

Plaintiff contends that the trial judge failed to properly leave to the jury the question of whether plaintiff was totally or partially disabled. We are unable to agree with this contention. It is extremely doubtful whether plaintiff could fairly and reasonably contend under his own evidence—certainly it would be impossible to do so under the defendant's evidence—that his disability was total and permanent in the light of the facts (1) that he had worked on numerous occasions after the accident; (2) had made wages of $2000 after the accident; and (3) that his own doctor testi-

fied for defendant that he could do ordinary work in two or three years; and (4) that his doctor at the time of the trial testified in his behalf, in reply to a question whether plaintiff could do any strenuous work in the future: "I don't believe that he could do any type of work that would require a great deal of physical activity."

Appellant correctly alleges that the law is as stated in *Saganowich v. Hachikian*, 348 Pa. 313, 35 A. 2d 343 (page 316) : ". . . Damages for loss of earning capacity arise out of an impairment of that capacity, and not out of loss of earnings. The earnings of the plaintiff subsequent to the injury, as compared with his earnings at the time of the injury, are merely evidence, but not conclusive evidence, as to whether his earning power has been diminished by the accident. The matter was clearly for the jury. See Yeager v. Anthracite Brwg. Co., 259 Pa. 123, 102 A. 418; Tingle v. C.-M. Newspapers, Inc., 318 Pa. 537, 179 A. 80."

The trial Judge recognized that this was the law and naturally and properly applied it to the facts of the instant case.

### I. Judge's Charge on Disability

Judge KENNEDY, the trial Judge, carefully analyzed and reviewed all the evidence and the contentions of both parties in a lengthy 39 page charge to the jury. In his charge he said, inter alia: ". . . He is only entitled to compensation for the injuries and the residual effects of the injuries that occurred at the time of this accident on February 12, 1952. I call that to your attention at this time because you can't give all of these directions for the measure of damage in just one or two sentences because again there is a radical variance in the opinion evidence of the medical testimony as to what is causing the disability of Mr. Sherman today and what has been causing it for the last three or

more years and *what the prognosis will be** and what time and which, if any, he will regain his health either fully or in part.

. . .

"Then the next item would be partial loss of future earning power. Now I say partial because he has had some earning power during the period up to date, $2000, but it covered a period of three years. So he would have a partial loss of future earning power based on his past record of earning power, his ability to earn. . . .

"Now we get back to the partial loss of future earning power. It is claimed here on behalf of the plaintiff that due to his physical condition, his disability, that his earning power is greatly limited in the future and will be for all time to come. That he has a condition here that can't be corrected. The defense does not agree with that. Doctor Steele is just to the contrary on that. However, that again is going to be for you. . . .

"Well, now, to get back to the partial loss of future earnings. You will determine what his condition is going to be in the future; whether he is going to have some partial recovery; whether he is going to get better; whether he is going to stay the same as he is *or whether he is even going to get worse.* Then from that take into consideration his past earnings, his education, his ability, his opportunities in life, how much has his earning power been reduced and how long will it be reduced. Well now, when you determine those things then you will determine how much in dollars and cents his earning power has been reduced and will be reduced in the future from year to year, and how long into the future. . . .

---

* Italics throughout, ours.

"Now then further, the question comes as to the probability of a partial or full recovery *or of no hope of recovery.*"

In dismissing the motion for a new trial the trial Judge aptly said: ". . . Every contention of the plaintiff as to impairment of earning power past, present and future was submitted fully and fairly to the jury for its determination. . . .

"The plaintiff was a streetcar operator at the time of the accident. He has not returned to this type of work since he was caused to be hurt. In 1954 his gross earnings were $3821.39. His net earnings during that year were not disclosed in the record. . . . During the three year period the plaintiff had three separate jobs and stated that he earned a total of $2,000. Based on the overall medical testimony *the jury could readily have found* that had he applied himself that *he could have earned considerably more than $2,000* during this period and hence reduced in amount his claim for loss of wages up to the time of trial. . . . The jury deliberated seven and one-half hours. They could have determined from the defendant's medical testimony that some but not all of the plaintiff's complaints were the result of the injuries he sustained in the accident.

"Plaintiff introduced into evidence medical and hospital expenses totalling the sum of $1400 including a statement from the V. A. Hospital in the sum of about $500. Considering all of these matters a verdict in such a substantial sum as $22,000 *certainly could not be labeled inadequate.*"

Since the defendant contended (by its doctor) that the plaintiff's physical troubles stemmed from tuberculosis of the spine, unconnected with trauma, and that he would be able to resume a normal occupation in two or three years, it thus became a question of fact for the jury whether the plaintiff's disability or some of it

was or was not the result of the accident for which the defendant was responsible, and, if so, for what period of time his disablement would continue.

A reading of the Court's entire charge to the jury—as distinguished from the isolated portions which are relied upon by appellant and quoted above—negatives the appellant's contention of prejudicial error on the subject of permanent disability.

In *Black v. A. E. Troutman Company*, 385 Pa. 138, 122 A. 2d 201, this Court said (page 140) : "In determining whether a court's instructions to the jury are erroneous we must consider that charge as a whole, and if it is not misleading we will not reverse, even though there be some inaccuracies or misstatements. Error cannot be predicated upon isolated excerpts if, when read with the remainder of the charge, a true and correct charge is revealed. Scanlan & Son v. Sherbine, 382 Pa. 376, 379, 380, 114 A. 2d 900."

In our opinion the trial Judge's charge, read as a whole, was, under all the evidence in this case, fair, reasonable and proper.

## II. Inadequacy

We have hereinabove reviewed in some detail plaintiff's evidence of his pain, suffering and injuries, as well as briefly summarized defendant's medical evidence as to plaintiff's condition, its cause and its prognosis. In considering the adequacy of the jury's verdict of $22,000, the trial Judge who saw and heard the witnesses, undoubtedly took into consideration the credibility of the witnesses as well as the defendant's medical evidence, *which the appellant has completely ignored* and which, as stated by *plaintiff* (appellant) himself, was as follows: "The substance of the medical testimony offered by the defendant was that defendant's doctors were of the opinion that plaintiff's condition *was not the result of the accident but was caused*

*by tuberculosis of the spine;* and that his condition had been arrested and would gradually improve, so that in about three years he should be largely recovered."

In the light of (1) the conflicting medical evidence with the radically different opinions expressed as to the cause of plaintiff's condition and its prognosis, and (2) the radical variance in testimony as to how and where the collision occurred and the negligence and contributory negligence of the respective parties, we cannot say that the lower Court's refusal of a new trial, because of the *inadequacy* of the verdict of $22,-000 constituted a manifest abuse of discretion.*

---

*It is sometimes erroneously contended that in considering the grant or refusal of a new trial, just as in a consideration of an appeal from the refusal to take off a nonsuit or from the entry of a judgment non obstante veredicto, all of the evidence must be taken in the light most favorable to the verdict winner. Of course this is not the correct test on an appeal from the grant or refusal of a new trial: *Londrino v. Equitable Life Assurance Society*, 377 Pa. 543, 105 A. 2d 333; *Shields v. Larry Construction Co., Inc.*, 370 Pa. 582, 88 A. 2d 764; *Yago v. Pipicelli*, 343 Pa. 222, 22 A. 2d 699; *Dupont v. Gallagher*, 360 Pa. 419, 62 A. 2d 28; *Jones v. Williams*, 358 Pa. 559, 58 A. 2d 57; *Karcesky v. Laria*, 382 Pa., supra; *Nikisher v. Benninger*, 377 Pa., supra; *Carpenelli v. Scranton Bus Co.*, 350 Pa. 184, 38 A. 2d 44; *Schwartz v. Jaffe*, 324 Pa. 324, 188 A. 295; *Pretka v. Wilson*, 325 Pa. 491, 190 A. 722; *Nark v. Horton Motor Lines, Inc.*, 331 Pa. 550, 1 A. 2d 655; *Wargo v. Pittsburgh Railways Co.*, 376 Pa. 168, 101 A. 2d 638; *Smith v. Allegheny County*, 377 Pa. 365, 105 A. 2d 137; *Edelson v. Ochroch*, 380 Pa. 426, 111 A. 2d 455; *Foster v. Waybright*, 367 Pa. 615, 80 A. 2d 801; *Bellettiere v. Philadelphia*, 367 Pa. 638, 81 A. 2d 857; *Morse Boulger Destructor Co. v. Arnoni*, 376 Pa. 57, 101 A. 2d 705; *Harris v. Ruggles Lumber Co.*, 376 Pa. 252, 101 A. 2d 917; *Koenig v. Flaherty*, 383 Pa. 187, 117 A. 2d 719; *Wilt v. Blazier*, 382 Pa. 143, 114 A. 2d 111; *Vereb v. Markowitz*, 379 Pa. 344, 108 A. 2d 774; *Martin v. Arnold*, 366 Pa. 128, 77 A. 2d 99; *Joseph v. Rochester Motor Coach Co.*, 380 Pa. 189, 110 A. 2d 214.

In *Karcesky v. Laria,* 382 Pa. 227, 235, 114 A. 2d 150, this Court quoting from *Nikisher v. Benninger,* 377 Pa. 564, 105 A. 2d 281, and *Carpenelli v. Scranton Bus Company,* 350 Pa. 184, 38 A. 2d 44, said (page 235) : " ' "When a court grants a new trial on the ground of inadequacy of the verdict an appellate court, in the absence of a gross abuse of discretion, will not interfere: Schwartz v. Jaffe, 324 Pa. 324, 188 A. 295; Pretka v. Wilson, 325 Pa. 491, 190 A. 722. When a trial court refuses to grant relief against an allegedly inadequate verdict an appellate court will exercise even greater caution in reviewing its action. . . ." ' "

We have considered, but deem it unnecessary to discuss, the other contentions advanced by plaintiff.

Judgment affirmed.

---

Dissenting Opinion by Mr. Justice Musmanno :

The last sentence in the Majority Opinion is a portentuous one, namely: "We have considered, but deem it unnecessary to discuss, the other contentions advanced by plaintiff." What are these other contentions, and why does the Majority deem it unnecessary to discuss them? As I survey the panorama of the law, one of those contentions is of superlative importance. Because of this Court's failure to discuss this certain feature of the case, judges may continue to charge juries on a standard which does not represent realities and, as a consequence, many unjust verdicts may hover on the horizon of future lawsuits.

The plaintiff in his appeal specifically charged that the Trial Judge erred in instructing the jury that if they returned a verdict for the plaintiff, they should reduce the amount allowed for impairment of earning power by deducting from that sum an amount equiva-

lent to 6%, interest accruable on the net sum. I do not say that the Trial Judge in this case, who is a very able, experienced and conscientious jurist, erred when he charged in the manner indicated, since he was duly following what was said by this Court in *Windle v. Davis*, 275 Pa. 23, 29, namely: "the interest must be computed at the lawful rate of six per cent." A duty devolves on this Court, however, to overrule *Windle v. Davis*, and, in doing so, grant a new trial because the plaintiff was subjected to the outdated standard announced therein. We should retire *Windle v. Davis* because it proclaims a financial criterion which has long ago been repudiated on the Rialto. There was a time, of course, when money was a very lively plant in a fertile soil. It only had to be watered with reasonable care and it would bloom with 6% and even higher rates of interest. In 1929 that plant suffered a blight from which it never thoroughly recovered. To speak today of 6% on bank deposits and other guaranteed, safe investments is to indulge in day-dreaming. Today it takes exceeding financial skill or extraordinary luck to produce a 6% ipso facto return on a given investment, and it is contrary to all demonstrated fact to assume that the average plaintiff in a personal injuries case possesses unusual talents in financial divination. Nor is it in keeping with our concept of fair dealing to subject him to the law of chance in obtaining what is his by operation of the law of the land.

I regard it as unfair, unjust, and inequitable to take from an injured man's verdict an amount equivalent to 6% when at most he might get only a return of 2 or 3% on his investment. Imposing the rate of interest laid down in the *Windle* case means actually taking from the injured man's pocket at least 3% of the amount the law has awarded him. This 3% is not a tax which goes to the government, it is not charity pay-

able to a hospital, it represents an amount of money turned over to the defendant—the very person who has injured the plaintiff, crippled him, and inflicted on him pain, suffering, and agony. If this is justice, it has indeed taken a strange and enigmatic form.

This Court had the opportunity in this case, which it entirely ignored, to definitely declare what the law should be *today* on the matter of deductible interest in personal injury damage cases. I submit that this Court should have announced that whatever amount the jury is to award the plaintiff for prospective loss of future earnings should be translated into that amount which when invested at the *prevailing rate of interest* (which is certainly not 6%), would equal at the end the total accumulation of all future losses resulting from impairment or complete destruction of earning power.

Another feature of the case which the Majority considered, but did not deem necessary to discuss, was the Trial Court's charge on taxes. The Trial Court instructed the jury: ". . . Of course he would only be entitled to reimbursement for his net earnings. I mean by that the amount of money he would have use of for himself and his family. Now we didn't go into details here because most of you people are family people and you know how much income tax you pay and how much is deducted from your pay envelope or your contribution you paid to Social Security. So you have a pretty good idea if a man is earning $3947 a year, has a wife and three children, even though there would be 10 per cent of that deducted by his employer he may get a refund. I don't know. They didn't go into figures on that and you will have to use your common sense on that but he wouldn't be entitled to what he never would have gotten when you are figuring wages. He would only be entitled to his net loss of wages, that money that he would have for the use of his family and him-

self as distinguished from money that he earned but he never got hold of . . ."

To suggest to the jury deduction for income tax and social security payments is clearly erroneous. What a man receives in a verdict for a broken leg, a crippled hand, a smashed pelvis, or any other damage done to his physical machine, which is the very generating power for wages, income, and profit, is clearly not taxable. A verdict is not income, it is replacement of flesh, bone and blood; it is giving back to a man what was his; it is restoring to the safe deposit of his being the wealth of health, energy, and motive power taken from him by the person required to pay the verdict.

If this Court had granted a new trial for the reasons just discussed, accompanying the decision with appropriate instructions, judges throughout the State would have been grateful for the clarification so direfully needed. As matters stand now, should judges charge that juries should whittle down verdicts by 6%. Should they direct that juries reduce verdicts on account of income tax and social security? Should they charge on take-home pay? They cannot possibly know with definitive accuracy about these things because this Court, while it has considered these vital matters, had decided it unnecessary to discuss them.

The Majority does discuss, however, the amount of the verdict and has concluded that the amount originally decided by the jury, less 6% interest, less income tax and social security payments, adequately compensates the plaintiff for his injuries.

What are the facts in this case?

Robert E. Sherman, the plaintiff, was injured in an automobile accident, legal responsibility for which was fixed against the defendant Manufacturers Light and Heat Company by a jury trial which resulted in a ver-

dict for the plaintiff in the sum of $22,000. At the time of the accident the plaintiff was 27 years of age, weighed 175 pounds, stood 6 feet in height, worked as a railway motorman, enjoyed excellent health, and participated in vigorous athletics. Since the mishap which overtook him on February 12, 1952, he has lost 45 pounds in weight and has deteriorated into semi-invalidism, spending time in hospitals and undergoing continuing medical treatment. Unable to return to his former employment he tried to earn a living at four successive different jobs but in each instance could not physically carry on. Dr. William S. McCabe testified that as a result of the accident the plaintiff is unable to lift his right leg ("cannot get it off the ground"), that he has a ¾" atrophy in the right leg 5" below the knee and a 1" atrophy of the same leg 5" above the knee; that the muscles have withered away at these points; that there is an impairment to the nerve supply in his right leg; that the quadricep groups of muscles in the leg "have been knocked out"; and that he experiences excruciating pains because of damage to the sciatic nerve. A myelogram performed in October, 1952 revealed that the plaintiff suffered from a herniated intervertebral disc, between the fourth and fifth lumbar vertebrae. He was hospitalized and underwent surgery for an attempted correction of this condition. Discharged from the hospital on January 31, 1953, he was re-hospitalized in April, 1953 because of a threatened nervous breakdown. On May 13, 1955, another myelogram revealed, according to Dr. McCabe, "a definite defect in the right hand anterior spinal canal region at L-4 which must be presumed to be a recurrent ruptured disc deformity. There are probably adhesions also at the tip of the caudal sac." Although this deformity could possibly respond to further surgery, another operation has not been decided upon because the

patient has not, it is averred, yet entirely readjusted from the results of the first operation.

The record is replete with references to intense pain suffered by the plaintiff. Dr. McCabe testified that the plaintiff "has got to learn to live with his pain now." Describing his routine at home, the plaintiff himself testified: "At home I have to use heat and no walking around or doing anything at all. I have to lie down all the time. Practically the only time I am allowed out on my feet is in the afternoon, he said, 'If you feel like it, if you like to go for a little walk, take a walk up to the corner,' but he said, 'Mostly stay on your back.' And I also have to use heat at home plus he gives me medication to help kill the pain a little bit so you don't feel like you are going to blow your top every time you go to move."

Dr. Philip A. Faix testified: "Q. Does he have pain? A. Marked pain. Q. Will you describe that pain? A. And we have to give him fairly marked opiates to give him any relief. Generally, we have tried several things, but we have been giving him empirin with codeine, a grain and a half and he usually takes four, five to six of them a day and that is a fairly good indication of the severity of his discomfort and pain. Q. I believe you mentioned some pain in the right leg? . . . A. The pain in the right leg here comes from the distribution of the sciatic nerve which Doctor McCabe has so beautifully described and it has been persistent and severe."

He said further: "We have established atrophy in his leg, established areas of numbness, minute reflexes in his achilles tendons and without any doubt in my experience, because we have referred to the short experience of the past and I think mine is fairly long, this is one of the most severe spastic backs that I have ever seen."

Although the plaintiff has followed the recommendations of his doctor he has not experienced relief:

"Q. Mr. Sherman, have you faithfully followed all the treatments that the doctor has told you to do? A. Yes, I have. Q. Have you taken all the medicine that they have prescribed for you? A. Yes, I have. Q. Are you able to stand and to sit since February 12, 1952, as you were able to sit or stand prior to the date of the accident? A. No. Q. Can you sit for any length of time? A. No. Q. Do you get irritated? A. Yes, I do."

It was the opinion of Dr. Faix that the plaintiff would never in the future be able to do any strenuous work: "Q. Is it your opinion that he will be able in the future to do any strenuous work? A. With the present findings I don't believe that he could do any type of work that would require a great deal of physical activity. Q. Well, would he be able to do any work that requires bending? A. No. Q. Would he be able to do any work that requires a lot of standing? A. No. Q. Would he be able to do any work that requires a lot of sitting? A. No. Q. Would he be able to do any work that requires walking? A. No."

The plaintiff himself testified: "Q. Are you able to do any kind of work? A. No, I am not."

On the basis of these excerpts from the transcript of testimony, aside from other evidence in the case, it would appear that the plaintiff could well contend that he was permanently and totally disabled for any employment which required physical exertion.

In his charge to the jury, the learned Trial Judge, while discussing the item of damages, described the plaintiff's loss of future earning power as "partial loss." In explanation of the term he said: "Now I say partial because he has had some earning power during the period up to date, $2000, but it covered a period of three years. So he would have a partial loss of future earning power based on his past record of earning power, his ability to earn."

The fact that an injured person has been able to earn some money between the date his injuries occurred and the date of the trial is not an inflexible standard of proof of reduced future earning power. Future earning power is to be determined from the evidence as to what the plaintiff's condition will be *after* the trial. (*Saganovich v. Hachikian,* 348 Pa. 313). Since the defendant contended that the plaintiff's physical troubles stemmed from tuberculosis of the spine, unconnected with trauma, and that he would be able to resume a normal occupation in two or three years, it thus became a question of fact for the jury whether the plaintiff's disability was or was not the result of the accident for which the defendant was responsible, and, if so, for what period of time his disablement would continue. The plaintiff maintains in this appeal that the Trial Judge in his charge to the jury assumed as established fact that the plaintiff was only partially or temporarily disabled and, with that erroneous assumption, the plaintiff was thus denied the expression of his full claim which was for damages based on total and permanent disability.

The Court's charge was a lengthy one and without question the Trial Judge conscientiously endeavored to cover all features of the case in a thoroughly impartial manner. However, when a trial judge essays to present with some particularity the respective merits of the contending parties, each side is entitled to be dressed in the best verbal attire it has worn during the trial. The plaintiff here insisted from the outset that, from the point of remunerative work, his life had no horizon, and that, occupationally, a total eclipse had set in for him. In support of this bleak prospect he presented medical testimony for the jury's evaluation. He himself testified at length on his hopeless future. A plaintiff's estimate of his physical condition is en-

titled to respectful and weighty consideration because certainly no one can know better than he how he feels, and whether or not he is in pain.

Although the able Trial Judge did tell the jury that the plaintiff claimed he had a condition which could not be corrected and that there was the possibility that with the passage of time his condition would worsen, we believe that he inadvertently conveyed the impression that it was his conclusion the plaintiff only proved a partial reduction in earning power and that, therefore, the jury should assess his damages on a partial reduction basis.

The Majority Opinion states that it is "extremely doubtful whether plaintiff could fairly and reasonably contend under his own evidence . . . that his disability was total and permanent in the light of the facts," and then enumerates the facts to justify this assertion. I will cite them as given in the Majority Opinion, with my comment immediately following:

(1) The Majority states the plaintiff "had worked on numerous occasions after the accident." This does not prove that the plaintiff is not *now* totally and permanently disabled. It only shows that the plaintiff honestly tried to work time after time. He tried four successive jobs and had to leave each one of them because of his disability!

(2) The plaintiff earned $2,000 prior to the trial. A total of $2,000 for three years for a man who was earning $3,000 per year prior to his accident is indication in itself of grave physical disability, when we know that the plaintiff made every effort to work.

(3) The Majority states that the plaintiff's "own doctor testified for defendant that he could do ordinary work in two or three years." The doctor referred to is Dr. Steele who treated the plaintiff for several months in the year 1953 and then did not see the plaintiff for

four years! Even so, when he was asked at the trial when he expected the plaintiff could return to an ordinary job, he did not reply definitively and with assurance, as the Majority Opinion seeks to convey he did. He replied as follows: "Well, *that is pretty hard to prognosticate because you can't know what turn these things are going to take at all times* but I don't see any reason why in two or three years he should not be able to." (Emphasis supplied).

(4) The plaintiff's doctor stated: "I don't believe that he could do any type of work that would require a great deal of physical activity." How does the Majority come to the conclusion from this statement—that the doctor believes the plaintiff can not do *any* type of work which requires a great deal of physical activity—proves the plaintiff's disability is not total and permanent?

It will be recalled that I quoted earlier in this Dissenting Opinion that the doctor testified that the plaintiff would not be able to do any work which required bending, or much standing, sitting, or walking. If that is not evidence of permanent and total disability, we need another definition of that term.

The Majority Opinion makes other assertions which I have considered but which I do not deem necessary to discuss—since they answer themselves.

Mr. Justice ARNOLD concurs in this Dissent.