Klusko v. Gaine-Murfit Chevrolet, Inc.

*Emanuel H. Klein*, for plaintiff.

434

*Ross & Smith,* for defendant.

SATTERTHWAITE, J., August 29, 1960.—Plaintiff, injured by the explosion of a truck tire rim assembly, has brought this trespass action to recover damages therefor from defendant, the employer of the mechanic who at the time of the accident was in the process of, or had substantially completed, the repair of the tire at plaintiff's request. The case was tried by jury, and a verdict was rendered in plaintiff's favor in the amount of $16,960.05. The matter is presently before the court on defendant's respective motions for judgment n. o. v. and for a new trial which raise questions of the sufficiency of the evidence of negligence on the part of defendant's employe, of causation, of plaintiff's contributory negligence, of rulings on evidence and instructions to the jury on matters of damages and of excessiveness of the verdict.

The relevant, and largely undisputed, factual background of the accident may be briefly summarized as follows: Plaintiff, a truck driver for a firm at McAdoo, was operating a tractor-trailer through Bucks County en route to Beverly, N. J., with a load of coal. At Newtown he developed tire trouble and stopped at defendant's place of business to have it repaired, defendant being the owner-operator of an automobile dealership or agency with appurtenant repair garage and service station facilities. Forsythe, the employe assigned to do the work on the tire by defendant's officer in charge, removed the deflated 10:00 by 20 wheel from the vehicle, took it inside defendant's garage building, removed the tire and tube from the rim assembly, replaced the tube with a new one with plaintiff's approval, reassembled the tube, tire and rim components, and had partially reinflated the same with an air hose to about 50 pounds pressure when

he was called away from the repair area to pump gasoline for a customer in another part of the premises. Plaintiff, who had been standing by in the garage while Forsythe worked on the tire, waited some 10 or 15 minutes for the latter's return, and then, apparently becoming impatient with the delay and intending himself to complete the reinstallation of the tire on the trailer, placed the tire upright from its position on the garage floor and applied a pressure gauge to ascertain whether it was fully inflated. As he did so, the rim assembly exploded or violently came apart, and one or more of the parts thereof were forcibly propelled against his person, causing injuries to his face, mouth and both knees.

It is clear from the evidence that the explosion did not occur by reason of any failure of the casing or tire proper which was undamaged and in good condition both before and after the event and, in fact, was later put back into active use. Although the new inner tube was found to be shredded and torn after the explosion, it is also clear from the record that this condition was the result, and not the cause, of the abrupt release of the rim components and that the explosion undoubtedly occurred by reason of the failure of the latter to remain locked in position as designed and intended. The reason or occasion for the latter consequence constituted the major source of conflict at the trial on the issues of negligence and contributory negligence.

The heavy steel rim assembly, apparently the type generally in use for trucks and other large vehicles, consisted of three parts: the large rim proper, the bead ring and the lock ring. The rim proper, cylindrical in shape, projected completely through the tire opening; one end was flanged to retain and confine one of the beads or reinforced inner portion of one of the sidewalls of the tire. The bead ring was placed over the other end of the large rim proper as it ex-

tended through the tire; it served as the other flange to hold the other bead of the tire in proper position. The lock ring, which was a simple narrow flat circle of steel, cut transversely at one point to permit flexibility for insertion into place, secured the bead ring in position on the large rim proper against the outward pressure of the inflated tire and tube by being set into a groove in the large rim and projecting therefrom over or outside a corresponding groove or recess in the bead ring. In view of the fact that air pressure in a tire such as the one in question was maintained at 75 pounds per square inch, it is not difficult to appreciate the tremendous forces which the fully inflated tire exerted against the bead and lock rings, and the obvious potential of dire consequences which would result if they failed to perform their retaining function as intended. All the witnesses who testified relative to the subject recognized the possibility of danger in the repair of such tires.

Plaintiff's position at the trial fundamentally was that the circumstances of the accident, particularly when considered in light of the opinions of an expert and long-experienced tire repair man who testified on his behalf, were sufficient to permit the jury to conclude that the explosion was due to Forsythe's negligent and careless assembly of the rim component, particularly the lock ring, or his unattentive failure to discover and remedy defects in the condition of such components, which necessarily would have been reasonably apparent in the course of the repair process.

Plaintiff's expert, Ralph N. Lewis, who had been in the tire business for 25 years and had assembled or changed hundreds of tires on rims of the type in question, testified at length on the function of the various parts of the rim assembly and the manner in which he and others in the business operated to guarantee against explosions such as that which formed the sub-

ject of this litigation. He testified that before reassembling the tire, tube and rim parts, he would inspect the latter to ascertain the good condition thereof and the freedom of the groove in the large rim from foreign matter so that the lock ring would fit properly therein. He would then place the tire and tube on the large rim, fit the bead ring and lock ring in position, tap the latter with a hammer to insure that it was properly seated, insert a small amount of air pressure to exert a slight outward force against the bead and lock rings and hold the beads of the tire in place, again tap the lock ring with a hammer and inspect it closely to see that it be firmly and evenly secured in its groove, and finally complete inflation to the requisite high pressure.

Lewis expressed the categoric and unqualified opinion that if the lock ring be properly seated, and remained properly seated through the early stages of inflation, a condition which could readily and safely be ascertained at that stage by close visual inspection of the assembly in general, and, particularly, of the lock ring, then it would be physically impossible for the ring components to come apart under pressure, and that even under gross overinflation or other mishandling, the tire proper would be the first to fail or burst and the rim assembly itself would remain intact. Defendant's two experts of like qualification and experience did not seriously differ with Lewis' objective statements of the function of the various parts of the rim assembly for such tires or the procedure in the reassembling thereof, although one of them indicated that tapping of the lock ring with a hammer might, in itself, cause the ring to be dislodged and was, therefore, not good practice. They did differ, however, with Lewis' opinion that, if properly assembled, the rim assembly could not come apart under pressure. Their position was that no matter how care-

fully the operation was done, there always existed the possibility, concededly rare, that the lock ring would be slightly deformed and hence improperly seated by reason of undetectable imperfections, burrs or rust specks, and that, therefore, the rim possibly could explode notwithstanding careful assembly and the lapse of even a considerable period of time thereafter.

In view of this conflicting evidence, it would seem clear that the inferences, deductions and conclusions of reasonableness, foreseeability and causation were matters for the jury's determination, and they were so submitted by the trial judge on instructions as to negligence, causation and contributory negligence of which no complaint was made, with one exception relating to superseding cause hereinafter mentioned. If the jury accepted Lewis' testimony, and particularly his opinion of impossibility of accident if care be taken to insure that the lock ring be properly seated and not obviously defective, and if the jury believed, as would seem almost self-evident from the recognized potential of danger, that a reasonably prudent man would exercise such care under the circumstances, then it might well have found, as it undoubtedly did, that the circumstances of the accident demonstrated Forsythe's failure to exercise such care and that plaintiff, by his mere presence in the garage area, was within the foreseeable orbit of danger resulting therefrom.

Under such evidence, the jury would further have been justified in finding, again as it undoubtedly did, that Forsythe's carelessness was not only a proximate, but in reality the only cause of the accident, and that the activities of plaintiff in his absence did not contribute thereto in the slightest degree. Although plaintiff unquestionably knew in general that changing truck tires of such high air pressure involved some risk of explosion and, in fact, had asked For-

sythe if he were not going to secure the tire by a chain to guard against such an eventuality, nevertheless, he had little personal experience in such matters and had a right to rely, under the circumstances, upon Forsythe's statement that he knew what he was doing and no chain was necessary. Against this background, considered in light of the further circumstances that Forsythe admittedly had completed all features of the repair in which attention to the lock ring would reasonably be said to be relevant, including the inflation of 50 pounds of air pressure, that the lock ring could not come out if properly seated, and that 10 or 15 minutes had elapsed after Forsythe's departure from the scene before plaintiff touched the tire, during which time no indication of incipient trouble was apparent, the jury might quite properly have concluded that plaintiff was not contributorily negligent.

While the finders of fact might have come to different conclusions had they believed defendant's witnesses, it seems clear that the case presented issues and matters of judgment which could be resolved only by a jury decision, and we neither can, nor believe we should, regard the verdict as being against the evidence, the weight of the evidence, the charge of the court or the law.

Likewise, we hold that the trial judge did not err in refusing further to complicate an already difficult case by instructing the jury on the extremely confusing concepts of superseding cause as requested by defendant. This principle, concerned with the application and effect of intervening negligence by a third person (see, e.g., Listino v. Union Paving Company, 386 Pa. 32, and the cases therein collected), obviously is presently inapplicable where only two parties are involved. Insofar as plaintiff's conduct raised the possible issue of an intervening break in the chain of causation between Forsythe's negligence and plain-

tiff's injury, the jury was fully instructed with respect thereto under the conventional definitions of proximate cause and contributory negligence. Under the latter concept, of course, they were specifically directed to find against plaintiff if negligence on his part "contributed in any degree, however slight, to the injury"; and this test imposed an even less exacting requirement of causation to invoke the bar of plaintiff's own negligent conduct than the test of proximate cause: Crane v. Neal, 389 Pa. 329.

The remaining questions raised by defendant go to matters of damages, and a proper disposition thereof requires a brief summary of plaintiff's injuries and the various ramifications and consequences thereof. Some part or parts of the exploding rim assembly apparently struck him about the face and across the front of both knees. He sustained lacerations of the right lower eyelid, had certain teeth knocked out and others chipped and a dental plate broken, and received a cut or contusion of the left knee. These injuries, although not inconsequential and undoubtedly painful and disabling for a time, apparently healed or were repaired more or less rapidly, and turned out to be of minor significance in comparison with the considerably more serious and aggravated damage to plaintiff's right knee, the extent and consequences of which formed the chief subject of testimony on this phase of the case at the trial.

As an immediate result of these injuries, plaintiff was hospitalized in Trenton, N. J., for five days following the accident, and was thereafter confined to his home for about a month. He was then able to get about, although with considerable discomfort and weakness in his right knee, and remained under the care of his physician until May 1957. He returned to his former job as an employed coal truck driver in December 1956, but found, however, that the pain

and lack of strength in his leg sharply limited other essential phases of his employment, such as manually unloading coal from a straight body truck, in which he had engaged as a necessary part of his work prior to the accident. As a consequence, and by reason of the unavailability of jobs as a truck driver in which such additional activities were not required, plaintiff had only sporadic employment until March 1958 when he obtained a full-time job which he held until April 1959. On the latter date, he underwent a surgical operation on his injured knee, and his period of convalescence, and consequent total incapacity, continued thereafter down to the time of the trial in June 1959.

Both prior and subsequent to the accident, beginning in 1954, plaintiff had two types of occupation. In the summer months, from April through September, he obtained employment as a truck driver for others. During the remaining and colder months of the year, he was self-employed in his own one-man business as a coal dealer using his own truck and his own labor in buying coal at the mine and retailing, delivering and unloading it in one or two-ton lots at a mark-up in price to individual customers along a route he had developed. From his employment by others for six months in 1955, he had an income of $1,124. From his own business for the other six months, after deducting his expenses of operation including depreciation on the truck and wages paid an occasional helper, he realized a profit of about $3,400. His average weekly income attributable to his own services over the year, therefore, was slightly in excess of $85.

During the middle six months of the year 1956, he was employed at an average wage of about $60 to $65 per week, and at the time of the accident on November 16, 1956, he had been employed on the hauling job, in the course of which he was injured, for about two weeks at a wage of $36 per week. In addition, he

engaged in his own coal dealer business, netting as before about $130 per week during January, February and March when this activity occupied his entire time; he also realized some extra income on his own time during the period he worked for others, amounting to an additional net varying from $8 to $33 per week. His average weekly income from personal services in 1956 prior to the accident again was about $85.

After the accident, however, and by reason of factors which the jury could have found were the proximate result thereof, his earnings were reduced. For the balance of the year 1956, he was able to earn only $50. In 1957 from outside employment he had wages of about $1,300, and, due to increased labor costs for hiring a man or men to perform certain phases of the physical work therein which he personally was unable to do because of his injured knee, he received net income of only about $750 from his own business. In 1958, he was employed at wages aggregating almost $2,800 and realized about $1,000 net from his own business. In the first three months of 1959, he had wages of about $500 and net income from his own business of approximately $220. He had no income thereafter to the date of the trial in June due to incapacity from the surgical operation in April, the disability from which was expected to last into July.

Plaintiff's medical testimony, and defendant offered none, disclosed that the crushing impact of the blow to plaintiff's right knee in the tire rim explosion had inflicted a deep laceration down to the bone and over three inches in length across the patella or kneecap. It also caused serious derangement of the interior tissues of the knee joint itself, resulting in traumatic arthritis, predicted by the medical evidence to be permanent and to result in a continuing weakness,

loss of strength and limitation of movement extending not merely down to the date of the trial in June 1959, but also into the indefinite future.

The immediate diagnosis of the various specific aspects of the injury, made by plaintiff's family physician a few days after the accident and corroborated by the testimony of an orthopedic specialist to whom plaintiff was referred in the spring of 1957, included four particular subjects of damage. First was a tearing or rupture of a crescent-shaped wedge of the fibrous cartilage known as the medial meniscus which separates and provides part of the resilient cushion or tissue on the inner side of the knee between the two load-bearing bones of the leg, the femur and the tibia. Second was the detachment or derangement of certain articular ligaments which stabilize the knee joint proper. The combination of these two injuries, and later the damage to the medial meniscus alone when the ligaments had healed, resulted in plaintiff's inability to have normal movement of the knee joint which would "lock" in particular positions under ordinary stress such as climbing stairs or kneeling. The surgical operation performed in April of 1959 removed the damaged medial meniscus and apparently was expected to obviate further difficulty arising on that score.

The third specific consequence of the accident was a chondromalacia of the inner face of the patella, which condition was a degeneration, by reason of trauma, in the texture of the cartilaginous surface, which does not naturally regenerate or repair itself as do skin or bone tissues, resulting in a roughened contact with other portions of the knee joint and causing a grating, crepitation, and restriction upon the normally smooth movement of the patella with and over the muscles and other structures of the knee. This developed into permanent arthritis affecting the

joint as a whole when the damaged cartilage was replaced by calcium or bony overgrowth, and the operation neither did nor could correct this condition. As a consequence thereof, the medical evidence indicated an indefinitely continuing partial disability in the use of the knee, estimated to be about 20 to 25 percent in degree.

The last immediate incident of the accident was the inflammation of the bursa of the knee, causing a considerable swelling and discomfort from the accumulation of excess fluids therein which had to be drawn off or aspirated periodically with a long-needled syringe. Whether this condition has been cured is not clear from the record.

Upon this brief outline of plaintiff's evidence on damages, we turn to the particular arguments raised relative thereto. Defendant first contends that the trial judge erred in not sustaining its objection to all evidence of plaintiff's earnings or earning power after March or April 1957, the approximate time when plaintiff admittedly had been advised to have surgical treatment of his right knee by the orthopedic specialist. This objection was properly overruled for several reasons.

In the first place, it, in effect, asked the trial judge to rule, categorically and as a matter of law, that plaintiff necessarily and inevitably was compelled by law to submit to such operation at the time in question and regardless of any considerations of reasonableness, urgency, serious nature and probable success of the treatment, or other circumstances. Such is not the law. As we stated in Gentile v. Rothermel, Jr., 4 Bucks 61, 62-63:

"It is well settled that an injured plaintiff cannot be compelled to undergo a serious and critical surgical operation necessarily attended with some risk of failure in order to reduce or limit damages for personal

injuries: (citing cases) On the other hand, it is equally well settled that if the plaintiff could be cured by an operation reasonably safe, and one which would commend itself to the judgment of a reasonably prudent man, the injury would certainly be less serious than one for which no hope of cure existed and the jury should, under such circumstances, consider the failure of the plaintiff to undergo such operation as an element which would reduce the amount of damages to which he would otherwise be entitled." (citing cases).

In addition to the cases therein cited, see also, Vallo v. United States Express Co., 147 Pa. 404; Vanormer v. Osborn Machine Co., 255 Pa. 47; McCaffrey v. Schwartz, 285 Pa. 561, and annotations in 11 A. L. R. 230 and 48 A. L. R. 356.

These considerations are for the jury, not the court, and in the instant case they were submitted under instructions to which defendant took no exception. It would have been manifestly improper for the trial judge totally to have removed these questions from the case, particularly at the very early stage of the trial when the subject first arose and no evidence of the nature and consequences of the suggested operation had yet been presented.

Secondly, the operation in fact, as it later developed and if plaintiff's uncontradicted medical evidence be believed, would not, and did not, effect a complete cure, and the residual permanent partial disability left the issue of plaintiff's decreased earning power still in the case, an issue to which the objected evidence was relevant in any event. Whether or not the beneficial effects of the operation insofar as it did correct certain of the damage, particularly the torn medial meniscus, should have been sooner obtained was one of the matters left for the jury to ascertain under instructions embodying the above principles.

Finally, the excuse given by plaintiff for his failure to have the operation performed in 1957, to wit, that he could not afford it, stood unimpeached throughout the remainder of the trial, and we do not agree with defendant's contentions that the statement was unjustified in fact or insufficient as a matter of law. There is not one iota of evidence in the case that plaintiff, obviously a man of limited income, in 1957 could have advanced approximately $500, the eventual cost of the operation and attendant hospitalization, or given up his employment and income for the time he would be incapacitated thereby. Since defendant did not see fit to rebut plaintiff's statement that he could not then afford the operation, or even to inquire how it happened that he did have the operation in 1959, we see no occasion for plaintiff to have volunteered to elaborate upon the subject. Moroeover, if the jury believed plaintiff in this respect, it could properly have considered the stated excuse in determining whether plaintiff's delay was reasonable under the circumstances: Feather v. Reading, 155 Pa. 187; 2 Restatement of Torts (Supp.) §918, comment (e) ; Annotation, 48 A. L. R. 356, at 371; compare Valencia v. Shell Oil Co., 23 Cal. 2d 840, 147 P. 2d 558, 561.

Defendant's next argument is that the trial judge improperly overruled its objection to testimony as to plaintiff's gross earnings as an employe without deducting amounts withheld by the employer for income and social security taxes. This objection is almost captious. It came at a time when plaintiff was testifying on the subject of his earnings from others, directly from copies of his W-2 forms which he had with him on the witness stand. The objection was overruled in language by which the trial judge tacitly invited defense counsel to establish any credits or deductions from wages by cross-examination, and counsel in fact did bring out the net figures on some of the W-2

forms when he cross-examined in his turn, but for reasons not apparent failed to pursue the subject as to others. Even if the ruling be wrong, therefore, a question we do not decide, defendant, not having availed of the free opportunity to overcome it, cannot now be heard to complain thereof.

Parenthetically, defendant did obtain the benefit of the trial judge's instruction to the jury on this subject, to the effect that damages for loss of earning power were compensatory only and allowance should be made in computing the same so as to reduce gross earnings by taxes or other deductions and thus insure that plaintiff would recover only that which he actually lost. Right or wrong, this instruction was felt justified by the trial judge in view of the charge of the lower court in Sherman v. Manufacturers Light and Heat Company, 389 Pa. 61, which, as the dissenting opinion in the Supreme Court pointed out, was not disapproved by the majority and was apparently one of the questions involved which the opinion of the court deemed unnecessary to discuss even though plaintiff was the appellant and complained, inter alia, of inadequacy of the verdict.

Defendant next challenges the charge of the trial judge on the subject of plaintiff's future medical and hospital bills. His out-of-pocket expenses paid or incurred before trial had been placed in evidence by stipulation, and in the main charge the trial judge had given apparently satisfactory directions to the jury as to how they should be considered and included as part of the verdict, if any, to which they found plaintiff entitled. No reference to future items was made until plaintiff's counsel suggested at the close of the instructions that his fourth point for charge be read, to the effect that reasonable sums expended "and to be expended in the future" for such subjects would be compensable. The trial judge, in effect, af-

firmed the request as an abstract proposition, which action is the basis for defendant's present position and to which special exception was taken after the jury retired, but then immediately went on to advise the jury that it was his personal opinion and recollection that there was no evidentiary basis for allowance of any future expenses, but that he did not foreclose the possibility that his recollection might be wrong. He further specifically cautioned the jury not to make an "educated guess" as to future expenses if they found no evidential basis therefore.

It now turns out, after time has permitted a close scrutiny of the lengthy transcript of the three-day trial, that although there were vague and inconclusive references in the medical testimony to expenses, no specific figures were given until the past bills were stipulated, and in fact there was no evidence on the subject of future expenses. Accordingly, the latter should not have been submitted to the jury. However, in view of the manner in which the question was given them, we cannot assume that the jury disregarded the cautionary statement of the trial judge, and we doubt that defendant has any real cause for objection or that the jury did allow any amount therefor in reaching its verdict. The total stipulated past medical and hospital expenses were in the odd amount of $960.05; the award of the jury was in the correspondingly exact amount of $16,960.05. We believe that defendant's contention, while technically correct, is lacking in substance and affords no actual basis for a new trial, and that as a practical matter the inadvertent error had no effect adverse to defendant whatsoever.

Defendant's final contention is that a new trial should be granted because the verdict was excessive, allowing $16,000, over and above actual expenses of $960.05, for loss of earnings prior to trial, decreased earning power in the future, and pain and suffering,

past, present and future. Under the circumstances disclosed in this record, we cannot agree with this position. While the award was possibly more than that which we would have made, we cannot in candor state that it was so excessive as to shock the conscience of the court in reviewing the same (Stringert v. Lastik Products Co., Inc., 397 Pa. 503), particularly when none of plaintiff's evidence on the subject of damages was contradicted or denied. See Jemison v. Pfeifer, 397 Pa. 81, 93, and the decreased purchasing power of the dollar be taken into consideration (compare Flank v. Walker, 398 Pa. 166, 171).

Plaintiff at the time of the accident was 23 years of age and had continued to be athletically active following his graduation from high school some years earlier, playing baseball with a town team in Mc-Adoo. He was in good health and had no history of any prior injury of consequence. In his combined employment by others and in his own personal service business, he had enjoyed an income prior to the accident of about $85 per week or about $4,500 per annum. For the last six weeks of 1956 following the accident, however, he made only $50, an apparent loss of about $450; he had similar reductions of earnings in 1957 of about $2,450, in 1958 of about $700 and in the five and one-half months prior to trial in 1959 of about $1,400, for a total of about $5,000. He endured pain and suffering for two and a half years before trial and in the opinion of his doctors will continue to have discomfort into the indefinite future. He suffered the pain, inconvenience, enforced idleness and tedium of the operation of April 1959, and the estimated 12 weeks incapacitating convalescence therefrom. And he faces the prospects of a 20 to 25 percent loss of use of his knee for the balance of his stipulated mortality table life expectancy of 45 years. In the type of occupation in which he has been engaged, and

in any type of physical labor for that matter, it is obvious that such a handicap will have a most serious effect upon his earning capacity. In view of all these factors, we cannot say that $16,000 was excessive compensation.

### Order

And now, August 29, 1960, for the reasons stated in the foregoing opinion, the respective motions of defendant for judgment n. o. v. and for a new trial are hereby denied and refused.