459 A.2d 1228

**Evelene DOHAN, Executrix of the Estate of David Dohan, Deceased, Appellant,**

**v.**

**Dr. C. Stephen STAHLNECKER and Riddle Memorial Hospital.**

Superior Court of Pennsylvania.

Argued March 8, 1981.

Filed March 25, 1983.

Reargument Denied June 7, 1983.

Petition for Allowance of Appeal Granted Nov. 22, 1983.

Wickersham, J., dissented and filed statement.

280

Edwin E. Lippincott, II, Media, for appellant.

William C. Beatty, Media, for Riddle, appellee.

Before CERCONE, President Judge, and WICKERSHAM and BROSKY, JJ.

CERCONE, President Judge:

The sole issue raised in this appeal is whether the lower court erred in its charge to the jury in setting forth the contentions of the parties in the proper light regarding the duty of care owed by appellee hospital to appellant's decedent. Upon a thorough review of the record, we now hold that the lower court's instructions concerning this matter were unduly vague. Accordingly, we reverse and order a new trial.

On September 22, 1970, Mr. David Dohan, appellant's decedent, awoke at 6:00 a.m. at his home which was located a few miles from appellee, Riddle Memorial Hospital (hereinafter "Riddle"). Initially, Mr. Dohan complained of pain in his arms, but the other symptoms of a heart attack soon manifested themselves and Dr. Stahlnecker, a long time family friend and personal physician of the decedent, was summoned. The doctor advised Mrs. Dohan that he would come to her residence immediately. However, when Doctor Stahlnecker did not arrive within one half hour, Mrs. Dohan called an ambulance to transport her husband to Riddle. She then telephoned Dr. Stahlnecker and advised him of this

course of action. He, in turn, called Riddle alerting the emergency room to the fact that a patient of his was on the way to that facility, that he was suffering chest pains, and that Dr. Stahlnecker would meet the patient at Riddle.

Dr. Stahlnecker arrived at Riddle a few minutes before the decedent who was immediately taken into the emergency room. The Riddle emergency facility was staffed by a registered nurse, a practical nurse, an EKG technician, and a resident physician with a sub-specialty in cardiology. At the request of Dr. Stahlnecker an EKG was taken which was thereafter read by Dr. Stahlnecker and then shown to the resident physician, Dr. Kohutiak. The EKG confirmed that the decedent had, indeed, suffered a myocardial infarction—a heart attack.

At trial, medical testimony was adduced to show that there is a high risk of death in the two hour period following the onset of a heart attack. This great risk is encountered due to temporary heart rhythm alterations—a condition called arrhythmia. Deaths seldom occur during this critical period, however, where life-sustaining facilities are available. It is undisputed that Riddle has such facilities and that it is fully equipped and staffed to care adequately for victims of coronary attacks. Nevertheless, Dr. Stahlnecker was unaware of this fact and testified at trial that a nurse had told him that Riddle did not have a coronary care unit. Thus, the doctor announced that he was going to have Mr. Dohan taken to Lankenau Hospital where he was on the staff. When Mr. Dohan and his wife asked about the reason for the change of hospitals, Dr. Stahlnecker replied: "They don't have the facilities here to care for this kind of a case." Mrs. Dohan testified that this statement was made in the presence of the resident physician, Dr. Kohutiak, but the doctor denied hearing the statement and Dr. Stahlnecker, the family doctor, did not recall having spoken these exact words. Unfortunately, Mr. Dohan died on the way to Lankenau Hospital due to a sudden onset of arrythmia.

It is important to note that at no time did any of Riddle's Emergency Room personnel inform Dr. Stahlnecker or the Dohans of the fact that Riddle had adequate facilities to care for the patient, nor did they inform them of the great dangers involved in transporting a cardiac patient so soon after his attack. In fact, Dr. Stahlnecker testified that one of the hospital's registered nurses told him the hospital had no life supporting equipment to meet Mr. Dohan's heart problem. As a result, the decedent was removed from the emergency room at Riddle and placed in the same ambulance that had taken him to the hospital. The Riddle employees watched this and did not protest. At trial, Dr. Kohutiak suggested that he did not want to interfere with the doctor-patient relationship between the decedent and Dr. Stahlnecker.[1] Dr. Stahlnecker himself testified that he would have ignored any suggestions made by Dr. Kohutiak with regard to not transporting the patient. However, this is understandable, since Dr. Stahlnecker was informed, as he testified, that Riddle did not have the life sustaining facilities for Mr. Dohan's heart problems. According to this information, there would be no reason for him not to try to get the patient to Lankenau for proper life-supporting treatment.

1. More significant for purposes of this appeal, however, was the testimony elicited from Mr. Donald Laughlin, the president of Riddle Memorial Hospital, and Ms. Marion Jocomo, a registered nurse who attended to Mr. Dohan upon his arrival at appellee's emergency room. This testimony concerned the duties imposed upon a resident physician, in this case, Dr. Kohutiak, under the hospital's by-laws to state *in writing* his approval of the transfer of a patient together with the precise reason supporting such a decision. Dr. Kohutiak admitted that during the period of his employment by Riddle as an emergency room physician, he had never been informed by other hospital personnel of his responsibilities under such by-laws. Dr. Kohutiak testified further that he, in apparent violation of hospital regulations, played virtually no role whatsoever in the decision to transport Mr. Dohan to another treatment facility.

Of equal importance, and relevant to the question of whether appellee hospital itself regarded Mr. Dohan as a patient, are Mr. Laughlin's persistent references to Mr. Dohan at trial as "the patient", and the fact that Mrs. Dohan was billed by the hospital for the services it performed.

Just prior to the commencement of the jury trial, the claim against Dr. Stahlnecker was settled and a joint tortfeasor's release was executed.[2] At the conclusion of the trial, the jury rendered a verdict in favor of both defendants, Dr. Stahlnecker and Riddle Memorial Hospital. Appellant's motion for a new trial was denied and this appeal followed.

In this appeal, Mrs. Dohan asserts through her counsel that the trial court erred in refusing to charge the jury as a matter of law that decedent herein was a hospital emergency room patient to whom a duty of reasonable care is owed. The trial court addressed this issue when responding to appellant's motion for a new trial:

> It was the opinion of the Trial Judge that the issue of the status of the decedent, at the time he was physically within the confines of the emergency room, was a question of fact that was to be the subject of jury determination. Taking that issue of fact from the ambit of jury determination would be an invasion of the function of the jury as fact-finder.

Our judicial system is based upon the experience of ordinary individuals—the jury—in applying the law, as stated by the judge, to the facts of the case as they are presented in court. A judge's charge to the jury is, therefore, a crucial part of our judicial system for without proper instruction, jurors would be left to surmise and conjecture in the adjudicative process. The late Justice Musmanno elaborated somewhat colorfully on precisely this point:

> Where the jury is being instructed on the law, the language must be imperative. A jury has no latitude of interpretation in the realm of the law. It, of course, has plenary authority to weigh the value of controverted facts (*that* indeed is its primary function) and to determine on the scale of credibility what witnesses are to be believed and not believed. But where legal principles are

2. Because knowledge of Dr. Stahlnecker's settlement would undoubtedly have had a prejudicial effect upon the jury, the trial commenced as if Dr. Stahlnecker were still a party to this action.

involved they have no discretion whatever. They must obey the judge as a ship's crew must obey their captain, as building workers must follow the blueprints of the architect; as nurses must carry through what is told them by the surgeon, and as pupils must faithfully hearken to their teacher. But in order to demonstrate *that* loyalty and put into effect the instructions they receive, the subordinates must know what the instructions are and what they mean. A ship's captain who shrouds his orders in ambiguity or indecisiveness takes the chance of having his ship run onto the rocks of disaster. Instructions to the jury which suggest doubt in the mind of the judge as to what the law is can only introduce into the jury box confusion where there should be certainty, indefiniteness where there must be sureness. Law at its best is a maze of complexities to the average layman. Jurors, therefore, are not be asked to find their own way through the jurisprudential webwork. They must have a surefooted guide, and that guide must be the judge. *Lobalzo v. Varoli,* 409 Pa. 15, 185 A.2d 557 (1962).

■ When reviewing a judge's charge to the jury, an appellate court will view the charge in its entirety in order to determine if the jury has been misled.

In determining whether a Court's instructions to the jury are erroneous, we must consider that charge as a whole, and if it is not misleading, we will not reverse, even though there may be some inaccuracies or misstatements. Error cannot be predicated upon isolated excerpts if, when read with the remainder of the charge, a true and correct charge is revealed.

*McAvenue v. Bryn Mawr Hospital,* 245 Pa.Superior Ct. 507, 513, 369 A.2d 743, 745–46 (1976), *quoting Sherman v. Manufacturers Light and Heat Co.,* 389 Pa. 61, 67, 132 A.2d 255, 259 (1957). Accordingly, the lower court cannot be reversed unless prejudicial error is present when the charge is viewed as a whole.

Germane to the issue of whether the hospital owed a duty to appellant's decedent, the judge charged the jury as follows:

Now, in this case the plaintiff has sued the hospital, Riddle Memorial Hospital, which is a corporation and I charge you that in determining whether the corporation was negligent, you may consider whether the corporation should have taken steps to advise its emergency room personnel of those standards, bylaws, policies and procedures which related to the operation of the emergency room.

Now, you will have those various regulations and as to the hospital you will have to consider whether in this particular instance they were—had a duty or obligation to follow these regulations.

Now, Mr. Cherry, the plaintiff's attorney, contends the hospital had these regulations. They were duty bound to follow them. David Dohan did come under the control of this emergency room as such and that the personnel there had a duty to step in and say in our emergency room we are in control here and this man doesn't leave.

He's also contending if you recall, that if they didn't at least do that, there was a duty on the part of the hospital personnel to tell Dr. Stahlnecker look, we have everything you need here to care for this man. He'd contending there was this obligation. They failed to perform it and that is negligence and that is negligence because the personnel did not follow the directives, standards set up here. But that's all for you to consider.

Now, on the other hand, the hospital especially is contending yes, we have rules and regulations, but they didn't control in a situation such as this. This man never became our patient. All we did was under these circumstances let Dr. Stahlnecker treat his patient there and furnish him the machine to take the—the operator for the EKG machine. When he wanted this injection given, we let our nurse do it. But we were never in control. We didn't have any duty to do anything other than what we

did and even if our regulations should indicate otherwise, these regulations were not set up to cover every particular case that may come up and certainly the situation such as here where the patient's own physician was present and acting.

. . . . .

In determining whether Riddle Hospital through its employees were negligent in its treatment of David Dohan, you are instructed that a hospital may be held liable for permitting its facilities to be used by a physician under circumstances where it knew or should have known of such act of malpractice and you will recall the testimony is they didn't know they took no part. Dr. Kohutiak left there and so forth. You will have to determine from the facts what duty the hospital had here. I have outlined to you the principles of law that you are to follow.

In determining the relative roles or relationships between the emergency room physician and Dr. Stahlnecker you may consider the testimony of Mr. Laughlin, the president of Riddle. And his testimony, my recollection, —you will have to determine what it was.—is that under the standards and bylaws the primary responsibility in the emergency room is on the emergency room physician supplied by the hospital.

Counsel for appellant subsequently requested that the following points for charge be read to the jury:

7. Even if you find that the attending physician remained in charge of David Dohan, Riddle nevertheless remained responsible for those services or acts which, according to good medical practice, it should have performed. *Aldan [sic] v. Providence,* 382 F.2d 163 (D.C.Cir.1967).

8. Once a person is brought to a hospital emergency room, and that person is accepted for care and treatment, the hospital must not act unreasonably in allowing him to be removed from the premises. The law requires that such patient be kept at the hospital and not transferred or removed if it is foreseeable that his

condition will be aggravated or his danger increased by such removal or transfer. *LeJeune Road Hospital v. Watson,* 171 So.2d 202 (Fla.App.1965).

The Judge granted this request and read these points verbatim. He then went on to reiterate the appellee hospital's contention in response to these points:

Of course, the contention here, of course, is that physically he was in our emergency room, but he was not an emergency room patient of ours. He was Dr. Stahlnecker's patient. But you will have to determine this from the facts.

Appellant's counsel took exception to the Judge's additional reference to the hospital's contention and requested that the Judge eliminate that contention as a matter of law and thereby remove the issue from the jury:

[PLAINTIFF'S ATTORNEY]: If the Court please, I'm asking your Honor to rule in this case as a matter of law that David Dohan was an emergency room patient. I'm asking your Honor to eliminate from the Jury's consideration the defense that the hospital has injected into this case and that is that they can find or they are at liberty to find he was not an emergency room patient. I do not believe the law will permit that finding from this evidence and I ask your Honor to rule as a matter of law that he was an emergency room patient and to direct the Jury in their deliberations to find that evidence.

THE COURT: Refused.

[PLAINTIFF'S ATTORNEY]: I move for the withdrawal of a Juror.

THE COURT: Refused.

■ Viewing this charge in its entirety, we conclude that the jury was not given the benefit of sufficiently clear instructions on the matter of the duty of care owed by appellee hospital to appellant's decedent as a matter of law under the facts of this case. Appellee correctly instructs in its brief that the lower court read appellant's points for charge # 7 and # 8 in verbatim fashion. However, we are compelled to agree with appellant that although points # 7

and # 8 constitute accurate statements of the legal duty of care owed by hospitals to persons receiving emergency room treatment,[3] the court's subsequent statement regarding appellee's response to these points had the inescapable effect of eradicating the imperative force with which a court's instructions on the applicable law should be invariably cloaked. Read in context, the court's gratuitous reference to appellee's argument regarding Mr. Dohan's status permitted the jury to draw the inference that it could disregard entirely the court's instructions with respect to the affirmative duties owed by the hospital to Mr. Dohan under the facts of this case. The instructions enabled the jury to find as appellee contended that Mr. Dohan never came under the control of the hospital's emergency room staff. The issue of who actually enjoyed the authority to control the treatment of Mr. Dohan is properly viewed as a matter of law and was itself wholly independent of the question of whether the hospital, according to its opinion, did or did not breach its duties to Mr. Dohan as clearly outlined in appellant's requested points for charge. The crucial defect of the lower court's charge was that it equated plaintiff's evidence with the hospital's allegations and did not make clear to the jury the difference. The effect of the charge was tantamount to leaving the jury with the impression that if the hospital said, "we didn't consider the patient an emergency room patient", the jury could render a verdict in favor of the hospital despite the facts presented by plaintiff that cried out for more equitable treatment. In view of appellee's defense that its staff

3. *See Fabian v. Matzko*, 236 Pa.Superior Ct. 267, 344 A.2d 569 (1975), wherein we specifically adopted Restatement (Second) of Tort § 323 (1965) which reads in its entirety:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
> (a) his failure to exercise such care increases the risk of such harm, or
>
> (b) the harm is suffered because of the other's reliance upon the undertaking.

left the responsibility of care solely to Dr. Stahlnecker while they sat mute and inactive, the court failed to take into consideration, in its charge, that the "captain of the ship doctrine", upon which the hospital apparently predicated its opinion that it had no responsibility to Mr. Dohan, is not viable in Pennsylvania. *Tonsic v. Wagner*, 458 Pa. 246, 329 A.2d 497 (1974).

Accordingly, since the lower court's charge failed to distinguish between evidence and allegations, the jury did not have the benefit of proper guidelines to decide this case. As a result the court erred in denying appellant's motion for a new trial. Reversed and remanded for a new trial.

Jurisdiction is relinquished.

WICKERSHAM, J., files a dissenting statement.

WICKERSHAM, Judge, dissenting:

I DISSENT. I would affirm on the opinion of the trial judge, the Honorable Robert A. Wright.